VENCEDORA OCEANICA NAVIGA-
CION, S.A., Appellant-Plaintiff,

v.

COMPAGNIE NATIONALE ALGERI-
ENNE DE NAVIGATION (C.N.A.N.)
and The Republic of Algeria, Appellees-
Defendants.

No. 82–2133.

United States Court of Appeals,
Fifth Circuit.

April 5, 1984.

Rehearing and Rehearing En Banc
Denied May 17, 1984.

Ed Bluestein, Jr., Houston, Tex., Donald
M. Waesche, New York City, for appellant-
plaintiff.

Joseph Newton, Houston, Tex., for appel-
lees-defendants.

Before RANDALL and HIGGINBOT-HAM, Circuit Judges, and McDONALD *, District Judge.

PER CURIAM:

The plaintiff, Vencedora Oceanica Navigation, S.A. ("Vencedora"), a Panamanian corporation and the owner of the vessel M/V KAPETAN MARCOS, N.L., brought this action against defendants Compagnie Nationale Algerienne De Navigation (C.N.A.N.) ("CNAN"), an instrumentality of the Algerian government, and the Republic of Algeria to recover for the loss of its vessel. Vencedora's claim is brought under Fed.R. Civ.P. 9(h), allowing maritime claims, and the Foreign Sovereign Immunities Act of 1976 ("FSIA" or the "Act").[1] The district court dismissed Vencedora's action against defendants because it lacked subject matter and personal jurisdiction. For the reasons set forth below, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On October 27, 1980, the KAPETAN MARCOS sailed from the Port of Sidi Kerir, Egypt, laden with a cargo of approximately 70,000 tons of Arabian crude oil en route to Coronna, Spain. At approximately 10:00 p.m. on October 31, 1980, there was a fire in the crews' quarters of the vessel. With the vessel about 280 miles from Palermo, Sicily and about 170 miles from Bejaia, Algeria, the officers and crew abandoned ship and were rescued by the T/V ESSO CAMBIA, which took the survivors to the Port of Annaba, Algeria. CNAN, an Algerian owned corporation that supervises Algeria's harbor and coastal tugs, ordered its tugs to render salvage assistance to the KAPETAN MARCOS. Upon the tugs' arrival at the scene, KAPETAN MARCOS' managing agent ordered that the ship be

towed to Palermo, Sicily. CNAN, however, ordered its tugs to tow the vessel to the Algerian Port of Bejaia, and the tugs complied with this order.

When the KAPETAN MARCOS arrived in Bejaia, her value in this damaged condition was between $3 and $3.5 million, and her cargo had an estimated value of about $18.5 million. A dispute soon developed between CNAN and the owners of the ship and cargo over the sum that should be posted in Algeria as security for CNAN's salvage services. At the request of CNAN, representatives of both hull and cargo, together with their English solicitors, went to Algeria in November 1980 to negotiate the amount of the bond to be posted for release of the ship.

CNAN first demanded $27 million in security for its salvage services, a sum well in excess of the value of the salved property. By the end of the November negotiations, CNAN was demanding that $15.75 million be posted in Algeria as security while the English solicitors offered to post security in the amount of $5 million in Algeria or $15.75 million in a neutral forum, such as France or the United Kingdom. These proposals were rejected and CNAN proceeded with a seizure for security of the KAPETAN MARCOS and her cargo by application to the Bejaia Court, Commercial Section.

The Algerian Minister of Transportation and Director General of the Merchant Marine ordered the vessel removed from the port because it constituted a threat to public safety. In late November or early December 1980, pursuant to court order, the KAPETAN MARCOS, together with her cargo, was towed by CNAN tugs from Bejaia, Algeria, to the Port of Arzew, Algeria. On December 21, 1980, a storm hit the Port of Arzew. The KAPETAN MARCOS, which had been under the control of the Algerian authorities since she was first brought to Bejaia, Algeria, in November

---

* District Judge of the Southern District of Texas, sitting by designation.

1. Act of October 21, 1976, Pub.L. No. 94–583, 90 Stat. 2891, *codified* at 28 U.S.C. §§ 1330, 1332(a)(1)–(4), 1391(f); 1441(d); and 1602–1611 (1976).

1980, went aground. The vessel's engine room flooded and Vencedora believes that the vessel has sustained additional body damage.

On January 14, 1981, Vencedora's representatives received a telex from the Algerian government stating that the vessel had become a "wreck" within the terms of the Algerian Maritime Code. On March 16, 1981, the Algerian government informed Vencedora's agent in London that its requests for the removal of KAPETAN MARCOS from the Algerian maritime area had not been honored and that the procedures for the stripping of Vencedora's rights had commenced.[2] On March 17, Vencedora replied that CNAN had made it impossible for the owners to remove the vessel and its cargo from the Algerian maritime area. Upon Vencedora's failure to remove the wreck, its ownership rights in the vessel were declared forfeited under the Algerian Maritime Code.[3] However, to date, the wreck has not been removed and the sale procedure provided by the Algerian Maritime Code has not commenced.

Vencedora alleges that CNAN and the Algerian government have tortiously deprived it of its vessel and have "caused and permitted [the vessel] to become a constructive, total loss." The defendants filed a motion to dismiss (1) for lack of subject matter jurisdiction and personal jurisdiction under the FSIA; (2) for failure to state a claim upon which relief can be granted; and (3) on the grounds of *forum non conveniens.*

The district court granted the 12(b)(1) motion, holding that the defendants were immune from the jurisdiction of the court under the FSIA. Vencedora had argued that the defendants were not shielded by the Act because their conduct had caused them to fall within the "expropriation" exception to immunity under the FSIA. 28 U.S.C. § 1605(a)(3). The court found this sub-section to be inapplicable:

> There is no question that rights in property allegedly taken in violation of international law are at issue in this action. However, there is no indication that the M/V KAPETAN MARCOS N.L., or any property exchanged for the vessel, is "owned or operated" by the Defendants. Because none of the narrow exceptions to the jurisdictional immunity of foreign states delineated in the Act applies to the case, this Court reluctantly determines that it lacks jurisdiction ....

The court later denied Vencedora's motion for rehearing, holding that the first clause of the "commercial activities" exception in

---

2. The Algerian Maritime Code provides that, following appropriate formalities, the wreck of a vessel will be sold and the proceeds deposited with the Establishment for Social Protection of Seamen. Algerian Maritime Code, Articles 367–83, Title 1, Chapter IV, Section IV, Salvage of Wrecks.

3. Decision of General Mercantile Marine Division, Republic of Algeria, The Minister of Transportation and Fishing, No. 81–366, May 23, 1981:

—Considering the ordinance No. 76–80 dated October 23, 1976 outlining the Maritime Code;

—Considering the decree No. 79–122 dated July 14, 1979 outlining the organization of the head offices of the Ministry of Transportation and Fishing;

—Considering the imperative security requirements with respect to navigation within the area located between STIDA and MACTA;

—Considering the summons notified on March 16, 1981, to the owners of the ship "Kapetan Marcos N.L.";

—Considering the proposals from General Director of Mercantile Marine.

DECIDE

ARTICLE 1—That pursuant to the Maritime Code, in particular to its articles 367 and the following articles, the owners of the ship "Kapetan Marcos N.L.," 39, 169Tx stranded in the area located between STIDA and La MACTA, be declared to have forfeited their ownership on the above mentioned ship.

ARTICLE 2—The National Ports Office is entrusted with the removal of the "Kapetan Marcos N.L." wreck.

ARTICLE 3—The removal expenses shall be—borne by Vencedora Oceanica Navigacion S.A./C/O Doran Ellas—Le Pieree Grece, the shipowner of "Kapetan Marcos N.L."

ARTICLE 4—The General Director of the National Ports Office, the commander of the National Service of Coast-Guard and the Director of Transportation and Fishing, shall be responsible, within their respective powers, for the implementation of this decision.

section 1605(a)(2) was also inapplicable. Vencedora now appeals.

Vencedora makes two objections to the district court's decision. First, Vencedora contends that the lower court erred in holding that it lacked subject matter jurisdiction over the cause of action by reason of the first clause of section 1605(a)(2) of the Act. Second, Vencedora contends that the district court erred in holding that neither the KAPETAN MARCOS nor property exchanged for it was "owned or operated" by CNAN and Algeria under section 1605(a)(3). We address each contention in turn.

## FOREIGN SOVEREIGN IMMUNITY

The FSIA was enacted to bring a degree of unity to the disposition of legal claims against foreign governments by removing the executive branch as the arbitrator of such claims and entrusting that responsibility to the judiciary. Prior to the enactment of the Act, the federal courts' power to assert jurisdiction over foreign states was controlled by two theoretically distinct doctrines: absolute sovereign immunity and "restrictive" sovereign immunity. See generally Cardoza, *A Note On Sovereign Immunity*, 17 Va.J.Int'l.L. 491 (1977); Lauterpacht, *The Problem of Jurisdiction Immunities of Foreign States*, 28 Brit.Y.B. Int'l.L. 220 (1951).

Until 1952, the State Department usually requested immunity in all actions against friendly foreign sovereigns.[4] But in the so-called "Tate Letter," [5] the State Department announced its adoption of the "restrictive" theory of sovereign immunity. Under this theory, immunity is confined to suits involving the foreign sovereign's pub-lic acts, and does not extend to cases arising out of a foreign state's strictly commercial acts. *See Verlinden B.V. v. Central Bank of Nigeria,* —— U.S. ——, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). In suits where a foreign state attempted to invoke absolute immunity as a defense, the executive branch examined the foreign state's activity, and the courts' grant of immunity turned on the outcome of the State Department's categorization of the conduct giving rise to the complaint. *See Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354 (2d Cir.1964), *cert. denied,* 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). *See also, Republic of Mexico v. Hoffman,* 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945); *Ex parte Peru,* 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); *Spacil v. Crowl,* 489 F.2d 614 (5th Cir.1974).

With its accommodation of diplomatic and political concerns, the State Department often lacked consistency, measured in legal terms, in applying the restrictive theory of immunity. *See Verlinden, supra,* at 1968. In response, the Departments of State and Justice proposed the FSIA to Congress. Passed in 1976, the FSIA codified the restrictive theory of sovereign immunity and attempted to provide a uniform statutory procedure for establishing subject matter and personal jurisdiction over foreign sovereign entities. Through the FSIA, Congress intended to eliminate the role of the State Department in the determination of the scope of foreign sovereign immunity and provide a regularized remedy against foreign commercial entities. *See generally* H.R.Rep. No. 94–1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.

---

**4.** The classic expression of the doctrine of absolute sovereign immunity is found in *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 116 (1812). In that opinion the Supreme Court upheld a plea of immunity squarely on the grounds that a sovereign was immune from the judicial powers of another state. The underlying rationale of *Schooner* rested on the theory of separation of powers, under which potentially embarassing foreign affairs were the domain of the executive branch.

*See also* Restatement (Second) of Foreign Relations Law of the United States § 41 (1965).

**5.** Letter from Jack B. Tate, Acting Legal Advisor of the Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dept. of State Bull. 984 (1952), *and in Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (Appendix 2 to opinion of White, J.)

Code Cong. & Ad.News 6604. *See also Verlinden, supra.*

The FSIA [6] grants sovereign immunity to foreign states,[7] their agencies and instrumentalities, except as otherwise provided by the Act.[8] There is personal jurisdiction when foreign states are served with adequate notice as specified in the Act [9] and when subject matter jurisdiction is present. 28 U.S.C. § 1330(b) (1982). Under section 1330(a), subject matter jurisdiction is present whenever the foreign state enjoys no immunity from the claim as provided in sections 1605–1607, the listed exceptions to immunity. These exceptions establish in certain specified types of cases the necessary contacts that must exist before United States courts can exercise jurisdiction.

■ Vencedora argues that the district court had jurisdiction under section 1605(a)(3), the "expropriations" clause, providing for jurisdiction over certain cases involving "property taken in violation of international law," and under section 1605(a)(2), providing for jurisdiction over certain cases relating to the commercial activities of a foreign state. We turn to these sections, noting that the party claiming FSIA immunity bears the burden of proving their nonapplicability. *See Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1378 (5th Cir.1980).

*Section 1605(a)(2)*

Vencedora first argues that the district court erred in failing to find subject matter jurisdiction under the first clause of 1605(a)(2). Section 1605(a)(2) provides in relevant part:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or the States in any case—
>
>> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state....

28 U.S.C. § 1605(a)(2).[10]

■ Vencedora contends that the district court had jurisdiction by virtue of the unrelated continuing business CNAN does in the United States. CNAN does not deny that it does continuing business in the United States, but asserts that jurisdiction under this clause results only where the cause of action arises from the business activity carried on in the United States. Because there is no nexus between CNAN's commercial activity and Vencedora's claim, we find that the district court properly dismissed Vencedora's action.

Despite strong congressional intent to promote uniformity in decision making through judicial application of the first clause of section 1605(a)(2), judicial readings of this clause have not been consist-

6. The provision conferring jurisdiction in the Act, 28 U.S.C. § 1330(a), creates in district courts:

> original jurisdiction without regard to amount in controversy of any non-jury civil action against a foreign state as defined in Section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under Sections 1605–1607 of this title or under any applicable international agreement.

7. The parties agree that the Republic of Algeria is a foreign state and that CNAN is an agency or instrumentality of such state within the meaning of the FSIA. It is also agreed that CNAN is engaged in commercial activity in the United States as defined in § 1603(a) & (b).

8. The general grant of foreign sovereign immunity in the FSIA provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act, a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in Sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604.

9. Service of adequate notice is also not at issue.

10. 28 U.S.C. § 1603(d) & (e) provide:

> (d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.
>
> (e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

ent. Courts of appeals and district courts have announced widely varying formulations of the jurisdictional scope of this clause, and these formulations may be divided into four categories: (1) a "literal" approach; (2) a "nexus" approach; (3) a bifurcated literal and nexus approach; and (4) a "doing business" approach.

A description of the first category, that favoring a literal approach, is contained in *Gibbons v. Udaras,* 549 F.Supp. 1094 (S.D. N.Y.1982), where the court said: "Read literally, 'clause 1' requires that the cause of action be directly 'based upon' the defendant foreign state's commercial activity in the United States, not merely 'based upon' an act performed by the defendant 'in connection with' that commercial activity. Thus it is arguable that, where the defendant foreign state has carried on a commercial activity in the United States, clause 1 confers subject matter jurisdiction over a cause of action based upon an act performed *in the United States* in connection with that activity, but not over a cause of action based upon an act performed *abroad* in connection with that activity." *Id.* at 1109 n. 5 (emphasis in original). This literal reading of the first clause of section 1605(a)(2) was rejected by the *Gibbons* court, and, on the rare instances where it has been applied by district courts, it has been repudiated by the circuits. *See infra Sugarman v. Aeromexico, Inc.,* 626 F.2d 270 (3d Cir.1980). *See also Gemini Shipping v. Foreign Trade Organization for Chemical & Foodstuffs,* 647 F.2d 317, 319 (2d Cir.1981).

The test set forth by the D.C. Circuit in *Gilson v. Republic of Ireland,* 682 F.2d 1022 (D.C.Cir.1982), seems to fall between a literal and a pure nexus approach. In *Gilson,* the court stated that "[s]ection 1605's 'based upon' standard is satisfied if plaintiff can show a direct causal connection between [the foreign entity's commercial activity in the United States] and the [acts] giving rise to his claims ..., or if he can show that [the commercial activity] is an element of the cause of action under whatever law governs his claims." *Id.* at 1027 n. 22. Although the court made this

statement in the context of interpreting the second, rather than the first, clause of section 1605(a)(2), its sweep has led at least one court to hold that the *Gilson* court's definition of "based upon" applies to all three clauses of § 1605(a)(2). *See Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1109 (S.D.N.Y.1982).

The Third Circuit has adopted a nexus approach more broad than either a literal approach or *Gilson*'s requirement that the commercial activity in the United States constitutes or directly causes the occurrence of an element of the cause of action. *See Velidor v. L/PG Benghazi,* 653 F.2d 812 (3d Cir.1981), *cert. denied,* 455 U.S. 929, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982), and *Sugarman v. Aeromexico, Inc.,* 626 F.2d 270 (3d Cir.1980). In *Sugarman,* the plaintiff alleged that an extended delay at the Acapulco airport before the departure of his Aeromexico flight back home to Newark caused him heart problems. The court found jurisdiction under the first clause of section 1605(a)(2), but apparently the fact that "Aeromexico operations in New York ... plainly constitute 'commercial activity carried on in the United States' " was not enough. Instead, the court looked for a nexus between Aeromexico's commercial activity in the United States and Sugarman's grievance. In finding subject matter jurisdiction, the court found a nexus between the plaintiff's grievance and Aeromexico's commercial activity from the fact that the delayed flight that was bound for New York City was the return portion of a round-trip flight, and because Sugarman had bought his tickets at a travel agency in New Jersey. 626 F.2d at 272–73. *See also Gemini Shipping, supra.*

In adopting a "nexus" approach, the *Sugarman* court specifically rejected the literal reading given to the first clause by the district court in dismissing Sugarman's claim. The court reasoned that Congress would have been clearer had it wanted to require that "the particular misconduct complained of take place 'in the United States,' " since Congress had been clear in

adopting such a requirement in the second clause of section 1605(a)(2). *Id.* at 273. The second clause excepts from immunity an action "based ... upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." The court also relied on the fact that such a limitation would be expected and perhaps required in light of due process considerations when, as in the second clause, the underlying commercial activity takes place outside the United States. But this would not be the expectation when, as in the first clause, "the acts complained of, although themselves extra-territorial, grow out of 'a regular course of commercial conduct,' 28 U.S.C. § 1603(d), which was 'carried on in the United States,' " for in such a case obviously there are no due process problems. 626 F.2d at 273.

An example of the remaining category, that applying a "doing business" test, is *Rio Grande Transport, Inc.*, 516 F.Supp. 1155 (S.D.N.Y.1981), although the court did not specifically refer to its interpretation by that name.[11] *Rio Grande* involved a collision in the Mediterranean between a vessel owned by CNAN, and an American-owned ship. The CNAN vessel maintained regular service between northern European ports and Algeria, and on this particular voyage was bound from Algeria to West Germany. Since the acts complained of had no particular nexus to the United States, the first clause applied only if jurisdiction could be based on CNAN's worldwide shipping activities, which had substantial contact with the U.S. The *Rio Grande* court reasoned that Congress's broad definition of "commercial activity" as including a "regular course of commercial conduct" meant that "Congress apparently did not intend to require that the specific commercial transaction or act upon which an action is based have occurred in the United States or have had substantial contact with the United States; only the broad course of conduct must be so connected." *Id.* at 1162. The court reasoned that a broad interpretation of "regular course of commercial conduct" was "consistent with 'Congress' goal of providing access to the courts to those aggrieved by the commercial acts of a foreign sovereign,' " and therefore found clause one subject matter jurisdiction based on CNAN's business in the United States. *Id.* (quoting *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 313 (2d Cir.1981)).[12]

---

**11.** *See* Case Comment, *Ship Owning Corporation's Contacts with United States Are Sufficient to Extend Jurisdiction Over Action for Damages Involving Maritime Collision,* 15 Vand.J.Int'l. L. 615 (1982).

**12.** An argument can be made that the Second Circuit approved of the "doing business" interpretation of clause one as a ground for jurisdiction under the Act in *Ministry of Supply Cairo v. Universe Tankships,* 708 F.2d 80 (2d Cir.1983). In *Cairo,* the court stated that the first clause of section 1605(a)(2) "withdraws immunity with respect to claims based not only on acts within the United States but also with respect to acts outside the United States if they comprise an integral part of the state's 'regular course of commercial conduct' or 'particular commercial transaction' 'having substantial contact with the United States.' " *Id.* at 84. By its literal terms, this rule might be read as establishing "doing business" as a jurisdictional basis. The rule requires that the acts complained of be an "integral part" of the "regular course of commercial conduct," as is always the case when "doing business" is the jurisdictional ground. Yet we believe this reading is too broad since the par-

ties did not raise the "doing business" issue. The court found jurisdiction because the complaint was " 'based upon' the [foreign sovereign's] entire course of activity in arranging in the United States for the purchase of the wheat and its transportation to Egypt," where the sovereign had wrongfully halted the discharge of cargo. Thus, when addressing the facts of the case, the court appeared to be focusing on the nexus between the act giving rise to the harm and the sovereign's commercial activity in the United States. We recognize, however, that the court did cite *Rio Grande* in support of its holding, thereby perhaps indicating that "doing business" falls within the confines of its interpretation of the first clause of section 1605(a)(2). Yet we are reluctant to construe *Cairo* as an adoption of the "doing business" interpretation of clause one when this interpretation was not before the court, and where the facts of this case meet the nexus test applied by the Second Circuit in *Gemini Shipping, Inc. v. Foreign Trade Organization for Chemicals and Foodstuffs,* 647 F.2d 317 (2d Cir.1981). *Gemini* was an action by a vessel charterer against the owner of the vessel's cargo for demurrage incurred as a re-

We believe that the Third Circuit's nexus interpretation of the first clause of section 1605(a)(2) is sound and therefore adopt it as our own. We note first that this clause cannot mean what it literally says. *See Sugarman, supra* at 273. A literal reading of the clause would require the act complained of to occur in the United States; "the drafters of the FISA intended no such niggardly construction." *Gemini Shipping v. Foreign Trade Organization for Chemicals & Foodstuffs*, 647 F.2d 317, 319 (2d Cir.1981).

That clause one is not as restrictive as it literally appears, however, does not force us to read it is broadly as Vencedora urges. We regard a nexus approach simply as a more effective means of carrying out the goal of requiring a connection between the lawsuit and the United States that the language of clause one appears to embody. A "doing business" test, on the other hand, focuses on the connection between the defendant and the United States; by definition it requires no specific connection between the lawsuit and the United States. Since, as the dissent notes, a "doing business" test is more controversial internationally than a nexus test, we think it likely that Congress specifically intended not to include "doing business" as one of the commercial activity exceptions, and did so in part through its restrictive wording of clause one. We note further that section 1605(a)(3), the expropriation exception, clearly embodies a "doing business" test. That Congress made itself clear there when it meant to include a "doing business" test helps persuade us that Congress did not clearly include a "doing business" test among the commercial activity exceptions on purpose.[13]

Our adoption of the nexus approach also implements the congressional intent underlying the passage of the Act. This determination is based in part upon the recognition that the Act "starts from a premise of immunity, and then creates exceptions to the general principle." House Report at 17, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6616. By codifying the restrictive theory of foreign sovereign immunity in the Act, the Congress sought to strike a delicate balance between those aggrieved by the acts of governmental entities and the sovereignty of foreign states. To interpret the first clause of section 1605(a)(2) as urged by the *Rio Grande* court would be to open the floodgates to any controversy around the world, against any foreign entity "doing business" in the United States. Such an unprecedented assertion of jurisdiction over a foreign state was clearly not the Congressional intent underlying the passage of the Act. As Bruno A. Ristau, Chief of the Foreign Litigation Section of the Civil Division of the Justice Department, stated:

It should also be stressed that the long-arm feature of the bill will insure that only those disputes which have a relation to the United States are litigated in the courts of the United States and that our courts are not turned into small "international courts of claims." The bill is not designed to open up our courts to all comers to litigate any dispute which any private party may have with a foreign state anywhere in the world.

*Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings Before the Subcomm. on Administrative Law and Governmental Relations of the*

---

sult of a 115-day delay in a Syrian port. The Second Circuit held that the charterer's suit for demurrage under the first clause was "based upon" the commercial activity carried on in the United States because the particular act sued upon, *i.e.*, the guarantee (of demurrage) was "part and parcel" of the purchase of rice in the United States.

**13.** See *Harris v. VAO Intourist,* 481 F.Supp. 1056 (E.D.N.Y.1979), where the court considered and rejected "doing business" as a basis of jurisdic-

tion under the Act where the injury complained of occurred outside the United States. Comparing the "based upon" language of the clause to the "transaction of business" clause language in many long-arm provisions, the *Harris* court concluded that "even though the defendants 'may be "doing business" here in the *traditional sense,'* there is no 'doing business' provision in the Act." *Id.* at 1061 (emphasis in original) (citations omitted).

*House Comm. on the Judiciary on H.R. 11315*, 94th Cong., 2d Sess. 31 (1976) (statement of Brunon A. Ristau).

We further believe the Third Circuit's nexus approach to be superior to the approach arguably adopted by the D.C. Circuit in *Gilson*. *Gilson*'s test would make for a tighter connection between the United States and the lawsuit, but we see no reason for requiring a tighter fit under clause one, as opposed to clause two. The Third Circuit's nexus test better serves the purpose of simply requiring a connection between the lawsuit and the United States.

We also find support for our nexus interpretation in *Arango v. Guzman Travelers Advisors Corp.*, 621 F.2d 1371, 1373 (5th Cir.1980), where we offered a glimpse of our understanding of the first clause of section 1605(a)(2). In *Guzman*, the Arangos' vacation package was aborted prematurely when Dominican Immigration officials denied them entry into that country when they arrived at the airport in Santo Domingo. The officials compelled the Arango's immediate "involuntary-rerouting" back to the United States, which resulted in substantial inconvenience and economic loss in their effort to get back to the United States. The Arangos brought suit in state court for non-performance of the vacation contract against four defendants, including Compagnia Dominicana de Aviacion ("Dominicana"), the national airline of the Dominican Republic. Dominicana removed the action to federal district court and then moved to dismiss the action, arguing first, that as a foreign sovereign it was immune from the jurisdiction of the court under the provisions of the FSIA, and second, that the Arangos' complaint failed to state a complaint upon which relief could be granted because the misconduct complained of was insulated from judicial scrutiny by the "act of state" doctrine. Without specifying the grounds upon which it relied, the district court granted this motion and dismissed the Arangos' suit against Dominicana. The Arangos appealed, but we dismissed their appeal because their complaint

against the remaining defendants was pending; therefore the dismissal against Dominicana had not constituted a final judgment. Although we found it unnecessary to decide whether Dominicana was subject to federal jurisdiction under the FSIA, we offered our interpretation of the first clause of section 1605(a)(2) in order to guide the district court on remand.

In construing this clause, we focused on whether Dominicana was immune from suit in federal court for breach of contract based upon miscarriage and non-performance of the vacation tour under the exceptions to the Act. In considering the applicability of the "commercial activity" exception under the first clause of section 1605(a)(2), we observed that "[t]he focus of the exception to immunity recognized in § 1605(a)(2) is ... *on whether the particular conduct giving rise to the claim in question actually constitutes or is in connection with* commercial activity ...." *Id.* at 1379 (emphasis added). Consequently, we determined that the plaintiff's action for breach of contract was "based upon" the sale of airline tickets and tourist cards by Dominicana in the United States and, consequently, was not barred by foreign sovereign immunity. 621 F.2d at 1380. *See also Matter of Sedco, Inc.*, 543 F.Supp. 561, 566 (S.D.Tex.1982). Thus, although we did not label our interpretation of the first clause of section 1605(a)(2) as a "nexus test," our construction of the clause mirrors that of the Third Circuit's in *Sugarman, supra.*

We note finally that an additional reason for our adoption of the Third Circuit's test is our desire to promote uniformity among the circuits. As we discussed before, good arguments can be made that the Second[14] and D.C. Circuits have not yet adopted tests different than the Third Circuit's nexus test. For obvious reasons, it is highly desirable to avoid circuit conflicts in the sensitive area of sovereign immunity.

It follows from our adoption of the Third Circuit's nexus test that Vencedora's claim

---

**14.** *See supra* note 12.

of jurisdiction under the first clause of section 1605(a)(2) fails.[15]

### Section 1605(a)(3)

■ Section 1605(a)(3) provides that a foreign state shall not be immune in any case

in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property . . . is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

While it is not clear whether any property was "taken in violation of international law" here, the district court decided that this exception did not apply because defendants did not own or operate the vessel.

Vencedora argues that "own" or "operate" may mean "possess" or "control," and that CNAN owned or operated the vessel when it initially towed the vessel to Bejaia and later to the Port of Arzew. We disagree with this interpretation of the statutory language. Although no court has interpreted "owned or operated," the legislative history of the FSIA indicates that section 1605(a)(3) was intended to subject to United States jurisdiction any foreign agency or instrumentality that has nationalized or expropriated property without compensation, or that is using expropriated property taken by another branch of the state. 1976 U.S.Code Cong. & Ad.News 6604, 6618. The vessel in this case thus would have been owned or operated under section 1605(a)(3) if CNAN or some Algerian agency had assumed control of the vessel and had used it to carry oil for the benefit of the Algerian government.

The record indicates that no act of CNAN resembled this scenario. That CNAN may have disobeyed Vencedora's request to tow the vessel to Palermo does not render the act of towing akin to owning or operating in the sense contemplated by Congress. Similarly, CNAN towed the vessel to the Port of Arzew only because it had been deemed a threat to safety in the first port. Finally, CNAN's seizure of the vessel for security falls short of ownership or operation.[16]

We also cannot conclude that the actions of the Republic of Algeria or any of its agencies triggered this exception. The only Algerian agency that possibly can be charged with ownership is the Maritime Administrative Authority, which began forfeiture proceedings against the vessel. Yet there is no question but that the Maritime Administrative Authority did not "engag[e] in commercial activity in the United States" as required by section 1605(a)(3). It follows that the district court did not err in concluding that the immunity exception in section 1605(a)(3) was inapplicable.

We conclude that the FSIA bars Vencedora's suit against CNAN and the Republic of Algeria, and that the district court correctly dismissed the case for lack of subject matter jurisdiction.

AFFIRMED.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring in part and dissenting in part:

I agree with the court's able opinion except I am persuaded that "doing business" is a jurisdictional ground under clause one. This reading is consistent with the statuto-

---

**15.** Vencedora claimed for the first time at oral argument that the assignment of jurisdiction in the FSIA must be read co-extensively with the constitutional grant of admiralty jurisdiction. This argument is without merit. The FSIA's statutory assignment of jurisdiction need not reach the outer limits of some underlying constitutional grant or otherwise be held unconstitutional. *See, e.g., Louisville & Nashville Railroad Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908) (statute conferring federal question jurisdiction given a narrower construc-

tion than the constitutional grant of jurisdiction.)

**16.** Moreover, there is no possibility that the vessel will be exchanged for property that will be owned or operated by CNAN. The Algerian Maritime Code provides that the proceeds from the sale of a wrecked vessel must be used for the "social protection of seamen." *See supra* note 2.

ry language once we acknowledge the implausibility of a literal interpretation. It also has support in the legislative history, and carries out the primary purpose behind the statute. While wary of potential jurisdictional excesses and possibilities for affronts to foreign sovereigns presented by the "doing business" jurisdiction, I am persuaded that the remedy for such ills is faithful adherence to Congress' mandate that the business carried on in the United States be "substantial," and use of the *forum non conveniens* doctrine. At the same time our exercise of this jurisdictional ground ought to be limited to cases that would otherwise be cognizable in federal court absent any issue of sovereign immunity. Such a restriction fulfills the congressional purpose of avoiding use of our court system by strangers with foreign disputes.

### A.

The FSIA presents a peculiarly twisted exercise in statutory draftsmanship. *See Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. 1094, 1105, 1106 (S.D.N.Y.1982) (characterizing the FSIA as "remarkably obtuse," "a ... statutory labyrinth that, owing to the numerous interpretive questions engendered by its bizarre structure and its many deliberately vague provisions, has during its lifetime been a financial boon for the private bar but a constant bane of the federal judiciary"); *Texas Trading v. Federal Republic of Nigeria*, 647 F.2d 300, 302 (2nd Cir.1981) ("vaguely-worded statute").

The interpretive exercise of this panel was anticipated and virtually required. Congress chose to make the exceptions in sections 1605–07 purposefully ambiguous, having "decided to put [their] faith in the U.S. Courts," and thus attempted to provide only "very modest guidance" to the judiciary. *Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings Before the Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary on H.R. 11315*, 94th Cong.2d Sess. 53 (1976) (testimony of Monroe Leigh, Legal Adviser, Department of State).

The Act's structure complicates matters. Rather than hinging personal jurisdiction on a defendant's contacts with the United States, the FSIA inquires whether there is subject matter jurisdiction. Then rather than mark subject matter jurisdiction by traditional indicia such as the citizenship of the parties or the substantive law under which the claim arises, the FSIA turns the inquiry to whether sovereign immunity exists. Thus, the scant language of the first clause of section 1605(a)(2) must: (1) establish the necessity that the claim somehow relate to a commercial activity, (2) establish subject matter jurisdiction with its traditional focus on the claim instead of the parties, and (3) specify the defendant's contacts necessary for personal jurisdiction, but (4) be sufficiently malleable to accomodate the shaping wisdom of the case-by-case process. It is not surprising that this "Gordian Knot" fails to give concrete guidance to courts. *See Texas Trading*, 647 F.2d at 307. The language of section 1605(a)(2) therefore provides a starting-point for my interpretation, but the primary congressional purpose of subjecting foreign governments acting commercially to jurisdiction like any other commercial entity ultimately serves as my compass. *See Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. at 1106. *See also* House Report at 7, *reprinted in* 1976 U.S.C.C.A.N. at 6605 (Act codifies restrictive theory of sovereign immunity); 28 U.S.C. § 1602 (in statute's "findings and declaration of purpose" it is declared that "states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned.").

### B.

No circuit court has ever directly faced the issue of whether the first clause of section 1605(a)(2) includes "doing business" as a jurisdictional ground. Although several circuit courts have found jurisdiction based on the existence of a nexus, the majority opinion is the first to deny jurisdiction for lack of a nexus where the defendant "does business" in the United States, the Third Circuit's "rejection" of a "doing

business" test being dicta in my view. *See Velidor v. L/P/G Benghazi*, 653 F.2d 812, 820 (3d Cir.1981). Further, as the majority opinion concedes, the Second Circuit arguably recognized "doing business" as a jurisdictional ground. While the majority is correct in regarding the language in *Ministry of Supply, Cairo v. Universe Tankships*, 708 F.2d 80 (2d Cir.1983), as dicta, because the "doing business" issue was not directly before it, I would be equally cautious with the interpretation of the Third Circuit's opinions.

Our panel then writes on what is essentially a clean slate. And while I share the majority's concern for uniformity among the circuits, I understand this circuit to be the first to address the "doing business" issue.

### C.

When the relevant portions of section 1603(d) and (e) are inserted into clause one of section 1605(a)(2), we are left with the task of construing:

A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case in which the action is based upon a regular course of commercial conduct carried on by such state and having substantial contact with the United States.

*See Matter of Rio Grande Transport, Inc., etc.*, 516 F.Supp. 1155, 1162 (S.D.N.Y.1981). Because this language cannot be interpreted literally, courts have been driven to substitutions for the words "based upon." The majority's substitution is "have a nexus with." While plausible, the search for a nexus between the United States and a claim in the usual case is a search for a specific act or acts in the United States, rather than for a regular course of commercial conduct in the sense of a carrying on of a commercial business in the United States. *See* House Report at 16, *reprinted in* 1976 U.S.C.C.A.N. at 6614–15 ("A 'regular course of commercial conduct' includes the carrying on of a commercial enterprise such as a mineral extraction company, an

airline or a state trading corporation.") I would expect a search for a nexus to be a search for an act or series of acts that will be part of the conduct of the business without constituting the entire conduct of the business. It follows that allowing only claims with a nexus to the "commercial activity" carried on in the United States would not exhaust the full range of clause one when "commercial activity" is defined as a "regular course of commercial conduct."

The "substantial contact" language of § 1603(e) also supports my reading. This language appears to draw upon the "minimum contacts" test of *International Shoe v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). That test marks off a "doing business" ground as involving "instances in which the continuous corporate operations within a state [are] thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from these activities." *Id.* at 318, 66 S.Ct. at 159. The FSIA's "substantial contact" language thus does not signal a congressional intent to enact more stringent a test than the "minimum contacts" necessary for "doing business" jurisdiction. *But see Maritime Intern. Nominees v. Republic of Guinea*, 693 F.2d 1094, 1109 and n. 23 (D.C.Cir.1982), *cert. denied*, — U.S. —, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983). To the contrary, the phrase could be lifted straight from *International Shoe*.

Furthermore, reading clause one to embody a "doing business" jurisdictional ground gives a coherent organizational structure to the three clauses of the "commercial activities" exception. If "doing business" is allowed as a basis for jurisdiction under clause one, then the three clauses of § 1605(a)(2) roughly correspond to three jurisdictional categories; personal jurisdiction exists where the defendant (1) does business in the United States, (2) commits an act within the United States but is not "doing business," and (3) does not commit a relevant act in the United States, but

causes a direct effect in the United States.[1] These categories reflect the development of jurisdictional principles, from *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877) (doing business), through *International Shoe* (committing an act can constitute minimum contacts), *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (effects can constitute minimum contacts), and beyond. *See* Note, *Effects Jurisdiction Under the Foreign Immunities Act and the Due Process Clause*, 55 N.Y.U.L.Rev. 474 (1980). Given these three historical grounds of jurisdiction and the appearance of § 1605(a)(2) as embodying these grounds, it seems reasonable to read clause one as embodying a "doing business" ground in addition to a "nexus" ground when the language can support this construction.

The legislative history also supports this construction, although the evidence is not conclusive. In discussing § 1330(b), the "Personal Jurisdiction" section—the most significant juncture of the section-by-section analysis for our purposes—the House Report stated:

Section 1330(b) provides, in effect, a Federal long-arm statute over foreign states (including political subdivisions, agencies, and instrumentalities of foreign states). It is patterned after the long-arm statute Congress enacted for the District of Columbia. Public Law 91–358, sec. 132(a), title I, 84 Stat. 549. The requirements of minimum jurisdictional contacts and adequate notice are embodied in the provision. *Cf. International Shoe Co. v. Washington*, 326 U.S. 310 [66 S.Ct. 154, 90 L.Ed. 95] (1945), and *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 [78 S.Ct. 199, 2 L.Ed.2d 223] (1957). For personal jurisdiction to exist under section 1330(b), the claim must first of all be one over which the district

courts have original jurisdiction under section 1330(a), meaning a claim for which the foreign state is not entitled to immunity. Significantly, each of the immunity provisions in the bill, sections 1605–1607, requires some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction....

House Report at 13, *reprinted in* 1976 U.S.C.C.A.N. at 6612. The statement that "the requirements of minimum jurisdictional contacts" are embodied in the Act, with the citations to *International Shoe* and *McGee*, supports a reading of the Act as coextensive with the limits of due process. There are other statements on which one may rely and other inferences one may draw from the legislative history, but this strong statement at the critical juncture is the more potent.

One may point to other statements in the legislative history which seem to emphasize the importance of the claim's relation to the United States as requiring a nexus, such as the above statement that sections 1605–1607 require "some connection between the lawsuit and the United States ...." But in the context of the entire quotation the connection can be equally read to be "doing business." Significantly, Congress specifically approved "doing business" jurisdiction for § 1605(a)(3) expropriations cases. Thus "doing business" must equal "some connection between the lawsuit and the United States" for the sentence to make sense. It follows for me that the majority opinion's reliance on the idea that "doing business" would not fulfill the goal of clause one in requiring a connection between the lawsuit and the United States is misplaced.

The focus of the House Report is not on "doing business" as a jurisdictional ground.

**1.** The relevant portion of § 1605(a)(2) provides: (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... (2)[ (i) ] in which the action is based upon a commercial activity carried on in the United States by the foreign state; [ (ii) ] or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; [ (iii) ] or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States ....

Yet, it does not necessarily follow that Congress' failure affirmatively to mention "doing business" jurisdiction evidences a congressional intent that this avenue to jurisdiction be unavailable to the plaintiff suing a foreign sovereign. "Doing business" was an established, basic jurisdictional ground, and it is unlikely that Congress would dismiss it without a clearer indication of its intent to do so. *Cf. Texas Trading v. Federal Republic of Nigeria*, 647 F.2d at 313 ("Before the FSIA plaintiffs enjoyed a broad right to bring suits against foreign states, subject only to State Department intervention and the presence of attachable assets. Congress in the FSIA certainly did not intend significantly to constrict jurisdiction; it intended to regularize it."). At the same time it was reasonable for Congress to focus on a nexus ground in its explanations, as the experience before passage of the FSIA was that the vast majority of claims specifically related to the contacts within the forum that gave rise to jurisdiction. *See* L. Henkin, R.C. Pugh, O. Schacter and H. Smit, *International Law* 514 (2d ed. 1979).

In light of the pre-FSIA history it is then understandable that the focus would be on the dispute's connection with the United States. In a direct sense a dispute with an entity "doing business" in the United States does have a relation to the United States, although the simple fact of "doing business" may not be enough for the suit to survive a motion for dismissal on *forum non conveniens* grounds. Finally, if the allowance of "doing business" jurisdiction meant that all suits between foreigners could get into U.S. courts so long as there was a "doing business" connection, then the legislative history would most certainly support a construction of the language as rejecting "doing business." However, as I explain below, "doing business" would not alone create jurisdiction.

My final argument is of the "forest for the trees" variety. We should not, in parsing the legislative history, overlook Congress' overall purpose. By codifying the restrictive theory of sovereign immunity, Congress recognized that those aggrieved by the acts of governmental commercial entities ought to be able to sue those governmental entities just as other, private, commercial entities could be sued. It seems the most probable congressional purpose was to extend "doing business" jurisdiction to foreign governments' commercial entities, thus placing those entities in positions to be sued not dissimilar from other foreign-owned companies.

At the same time the FSIA's "doing business" jurisdiction ought to be strictly limited to what I perceive to be Congress' purpose in its enactment. I think it self-evident that Congress did not intend to extend "doing business" jurisdiction to suits between foreigners unless, as in this case, the jurisdiction of the federal courts would extend to cover the case absent sovereign immunity. Notwithstanding that under the FSIA Congress did in general extend federal jurisdiction to suits between foreigners as long as one of the exceptions to immunity is present, *see Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), I think Congress would have been explicit had it meant to extend United States jurisdiction to all suits between foreigners and foreign states without any nexus at all between the cause of action and the United States. Extending "doing business" jurisdiction to any claim arising anywhere in the world between foreigners and foreign states would be an unprecedented and radical extension of United States jurisdiction; surely it was not contemplated by the FSIA. My reading of the FSIA as allowing for "doing business" jurisdiction allows for "doing business" jurisdiction only in cases that would otherwise be cognizable in federal courts under this jurisdictional ground absent any issue of sovereign immunity. Congress was unquestionably wary lest our federal courts become international courts of claims. With the interpretive burden Congress has given the courts in administering the statute and the strong congressional purpose pushing toward allowing "doing business" as a ground, a halfway construction is justified.

Even if we allay the concern that the FSIA could comprehend suits between foreigners whenever a foreign state is "doing business" in the United States, "doing business" is a more controversial jurisdictional ground to assert over foreign entities than is a nexus ground. *See* Carl, *Suing Foreign Governments in American Courts: The United States Foreign Sovereign Immunities Act in Practice,* 33 Sw.L.J. 1009, 1058–61 (1979). *But c.f. Restatement of Foreign Relations Law of the United States (Revised),* Tent.Draft No. 2 § 403(2)(b) (1981) (suggesting "links such as nationality, residence, or *economic activity,* between the regulating state and the persons principally responsible for the activity to be regulated" as considerations recognized by international law that are relevant to a country's assertion of "jurisdiction to prescribe" (emphasis supplied)). Given some judicial readings of "doing business" jurisdiction, any queasiness of those at the international bar over our "doing business" jurisdiction is not without some justification. *See, e.g., Bryant v. Finnish National Airline,* 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965) ("doing business" jurisdiction found on basis that defendant maintained a one-and-one-half room office for publicity purposes in New York). Yet I am confident that U.S. courts could responsibly assert "doing business" jurisdiction in the FSIA context in such just ways as to avoid affronts to foreign sovereigns. By adhering strictly to the "substantial contact" standard, and by use of *forum non conveniens* dismissals, our courts could screen out those cases that do not belong here. My construction would thus not threaten to turn our courts into international courts of claims. The power to hear a claim and the willingness to do so are quite different.

Here, although the case would likely succumb to a motion to dismiss on *forum non conveniens* grounds, *see, e.g., Perusahaan Umum Listrik Negara v. M/V Tel Aviv,* 711 F.2d 1231 (5th Cir.1983); *Veba-Chemie A.G. v. M/V Getafix,* 711 F.2d 1243 (5th Cir.1983), absent CNAN's status as an instrumentality of a foreign government the admiralty jurisdiction of the federal courts over the claim against CNAN would be unquestionably established, notwithstanding that both Vencedora and CNAN are foreigners. Involved are time-worn elements of a complaint charging a salvor with misdeeds: that the salvor without good reason prevented the distressed vessel's master for rejoining his ship,[2] that the salvor without good reason did not comply with the request of the owner to bring the salved property into a nearby, safe port, and that these misdeeds resulted in the destruction of the vessel. *See 3A Benedict on Admiralty* §§ 125, 119 at 8–39 (7th ed. revised 1980); *Byrne v. Johnson,* 53 F. 840 (5th Cir.1893). Absent *in rem* jurisdiction, all Vencedora would have to establish would be that jurisdiction over CNAN would be consistent with due process. *See The Belgenland,* 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152 (1884). Thus since this case would otherwise be cognizable in our admiralty courts absent a claim of sovereign immunity, the purpose behind the FSIA pushes toward an interpretation that would allow for our exercise of jurisdiction.

### D.

The majority opinion frets over Vencedora's foreign status. But the tenuousness of any connection between this particular dispute and the United States is no reason to disallow "doing business" as a jurisdictional ground in all cases. Had an American company initiated this suit the equities might well lie in favor of U.S. jurisdiction. Disallowing "doing business" jurisdiction under the FSIA may adversely affect not just foreigners whose suits clearly do not

---

**2.** Vencedora alleges that CNAN refused to allow the master of the KAPETAN MARCOS to accompany the tugs on their salvage mission. Vencedora says that the survivors of the crew of the KAPETAN MARCOS arrived in Bejaia before CNAN ordered its tugs from Algerian ports to salvage the KAPETAN MARCOS. Vencedora states that the port authorities at Annaba led the master of the KAPETAN MARCOS to believe that he would be permitted to board one of the tugs and return to his ship, but that the CNAN tugs left without him.

belong in the U.S., but also U.S. citizens whose suits would otherwise be cognizable in U.S. courts if the defendant was not a sovereign instrumentality. This inquiry is relevant to our central effort of plumbing congressional intent. I am persuaded that had Congress anticipated the issue it would not wish to deny access to U.S. citizens injured abroad by a foreign sovereign entity doing business in the United States.

It might be argued that clause three of § 1605(a)(2) would prevent U.S. citizens in this situation from being denied access to U.S. courts. Clause three allows for jurisdiction over claims based upon acts outside the U.S. in connection with commercial activity outside the U.S. where there are direct effects in the United States. Although there is little precedent on the scope of the "direct effects" clause, it is doubtful that this clause would avoid the loss caused to U.S. plaintiffs by the disallowance of "doing business" jurisdiction.

Clause three lays out two relevant limitations on jurisdiction: (1) the effect must be "direct," and (2) the effect must be "in the United States." Though Congress gave little hint of what is meant by "direct," a thoughtful commentator points out that not all injuries proximately caused by a tort will amount to a "direct effect." *See* Note, *Effects Jurisdiction Under the Foreign Sovereign Immunities Act and the Due Process Clause,* 55 N.Y.U.L.Rev. 474, 506 (1980). Thus, the limitation that an injury be "direct" in all likelihood restricts the reach of U.S. jurisdiction over actions by U.S. plaintiffs based on acts outside our territory, in comparison to "doing business." Under "doing business" jurisdiction, if the defendant "does business" in the U.S. the fact that the injury suffered in the United States was not the primary injury would not defeat jurisdiction.

It is generally easy to determine whether a personal injury has occurred "in the United States." Courts have naturally adopted a test of looking to see where the injury occurred, rather than whether or not the injury has occurred to a person who lives in the United States. If section 1605(a)(2) does not include a "doing business" test, then use of this "direct effects" test alone would of course cut off a number of U.S. plaintiffs from U.S. courts in suits based on torts occurring abroad where the defendant does business in the U.S.

It is more problematic to decide whether a financial injury has occurred "in the United States." Nevertheless, it is likely that U.S. business plaintiffs suffering financial injury would be foreclosed from bringing suit in U.S. courts in a significant number of cases unless U.S. courts took the unlikely and arguably improper course of adopting a test for "directness" that went beyond primary injury as well as a broad test for location of injury. In sum, "direct effects" jurisdiction would not completely mitigate the loss by U.S. plaintiffs of forum selection caused by ridding the courts of "doing business" jurisdiction over sovereigns. I think this concern is relevant to congressional purpose and supports my view that "doing business" jurisdiction should be recognized under the FSIA.

### E.

Underlying the court's opinion is the fear of affronts to foreign sovereigns hauled into our courts over disputes having nothing to do with the United States. Undoubtedly many cases over which United States courts could have jurisdiction only because of an FSIA "doing business" exception ought not be heard in the United States. But an over-broad jurisdictional ban is not the best way to exclude such cases. Perhaps I am more confident in our ability to weed out cases on an individualized basis. But, more importantly, I believe those cases that could survive a motion for *forum non conveniens* dismissal—especially such cases involving U.S. plaintiffs—ought to be heard because Congress meant for commercial, governmental entities to be subject to suit like any other commercial entity.