923 F.2d 380
 1991 A.M.C. 2522
 STENA REDERI AB, a Swedish Corporation, Plaintiff-Appellee,
v.
COMISION de CONTRATOS del COMITE EJECUTIVO GENERAL del
SINDICATO REVOLUCIONARIO de TRABAJADORES
PETROLEROS de la REPUBLICA MEXICANA,
S.C., a Mexican Corporation, Defendant,
Petroleos Mexicanos, the nationalized petroleum company of
the United Mexican States, Defendant-Appellant.
 No. 90-2095.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 11, 1991.
 
 Douglas S. Johnston, Houston, Tex., Charles C. Crady, III, Shelley A. Bush, Crady, Jewett & McCulley, Houston, Tex., for Amicus United Mexican States--Ambassador Alberto Szekely, Legal Advisor, Secretariat of Foreign Relations, United Mexican States, Houston, Tex., E.U.A.
 Christopher O. Davis, James D. Wise, Jr., Brown, Sims, Wise & White, James N. Isbell, Houston, Tex., Phelps Dunbar, Sheryl Bey, New Orleans, La., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Texas.
 Before THORNBERRY, JOHNSON and DAVIS, Circuit Judges.
 JOHNSON, Circuit Judge:
 
 
 1
 During its brief lifetime, the Foreign Sovereign Immunities Act of 1976 ("FSIA") has been "a constant bane of the federal judiciary."[1] This Court is once again called upon to interpret the labyrinthine provisions of the FSIA, and the task is no easier now than it has been before. Stena Rederi AB ("Stena"), a Swedish corporation, initiated a negligent misrepresentation and breach of contract action in federal district court against Petroleos Mexicanos ("Pemex"), the nationalized petroleum company of the United Mexican States,[2] and Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C. ("Comision de Contratos"), a Mexican business entity. Unsure that it could obtain personal jurisdiction over Comision de Contratos, Stena secured a writ of garnishment on the credits and effects of Comision de Contratos in Pemex's possession. The district court denied Pemex's motion to dismiss for want of jurisdiction under the FSIA. Persuaded that Pemex is immune from suit, we reverse the judgment of the district court and remand with instructions that the district court dissolve the writ of garnishment and dismiss the claims against Pemex.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 2
 In the spring of 1984, Petroleos Mexicanos initiated a project to repair several offshore petroleum production platforms in the Bay of Campeche in Mexican territorial waters. Pemex's extensive plans for the repair project required an experienced contractor and specialized equipment. After lengthy negotiations, Comision de Contratos, a Mexican cooperative society which administers contracts for the national oil workers' union, entered into a contract to perform the necessary repairs on the production platforms. Comision de Contratos in turn retained Mexicana de Servicios Maritimos, S.A. de C.V. ("MSM"), a Mexican shipping corporation, to furnish equipment at the site of the repairs.
 
 
 3
 Among the equipment MSM supplied Comision de Contratos was the STENA SEAHORSE, a diving support vessel MSM acquired from a Swedish corporation, Stena Rederi AB. The circumstances of MSM's receipt of the STENA SEAHORSE are unclear, but Stena claims that a number of Pemex representatives attempted to persuade Stena officials to sell the vessel to MSM. One of these representatives, Captain Andres Mendez Cid, allegedly traveled to Brownsville, Texas, to convince Stena officials to release the STENA SEAHORSE. Whatever the involvement of these Pemex representatives,[3] Stena ultimately agreed that MSM could charter the STENA SEAHORSE with the understanding that MSM eventually would purchase the vessel. The STENA SEAHORSE arrived in the Bay of Campeche under a head charter between Stena and MSM and a subcharter between MSM and Comision de Contratos.
 
 
 4
 From December 28, 1984, to October 15, 1985, Comision de Contratos' employees utilized the STENA SEAHORSE in platform repairs. During most of this period of time, Stena was entitled to receive charter hire from MSM. However, MSM suffered a cash flow difficiency--allegedly because Pemex and Comision de Contratos diverted payments they owed MSM on the subcharter agreement to a secret bank account in Hidalgo, Texas--and was unable to meet its obligations under the charter agreement. In July 1985, MSM attempted to postpone the maturity of its growing debt with Stena; after the parties negotiated a long-term financing agreement that included two mortgages on the STENA SEAHORSE and Stena's guaranty of MSM's debt, MSM finally purchased the STENA SEAHORSE.
 
 
 5
 MSM's ownership of the STENA SEAHORSE was shortlived. On October 15, 1985, Pemex and Comision de Contratos permitted the vessel to leave the Bay of Campeche for its annual drydock inspection and repairs in Mobile, Alabama. MSM could not pay the shipyard for the costs of its repairs to the STENA SEAHORSE, and United States marshals subsequently arrested the vessel. After the marshals sold the vessel to one of Stena's sister corporations, MSM defaulted on payments of the indebtedness secured by one of the mortgages on the STENA SEAHORSE. Pursuant to its guaranty of MSM's debt, Stena paid approximately five million dollars to a New York bank to satisfy the indebtedness.
 
 
 6
 In August 1986, Stena filed suit against MSM in a Mexican court alleging breach of the head charter agreement. As damages, the Mexican court awarded Stena all of MSM's claims against Comision de Contratos under the subcharter agreement. After diplomatic intervention from the Swedish and Mexican governments, Pemex and Stena attempted to negotiate a peaceful resolution to Stena's remaining claims. However, settlement negotiations in Mexico City and McAllen, Texas, were unsuccessful.
 
 
 7
 Stena then filed the instant action against both Comision de Contratos and Pemex in the Southern District of Texas. Stena alleged, as a third party beneficiary and judicial successor to the rights of MSM, that the defendants had wrongfully breached the subcharter agreement. Further, Stena alleged that defendant Pemex had negligently misrepresented that it would direct and supervise the operation of the STENA SEAHORSE in the Bay of Campeche. Asserting that Comision de Contratos had insufficient contacts to support in personam jurisdiction in the United States, Stena sought to acquire quasi in rem jurisdiction over Comision de Contratos through the issuance of a writ of garnishment on Comision de Contratos' credits and effects in Pemex's possession.[4]
 
 
 8
 Pemex filed numerous motions in response to Stena's allegations, including a motion to quash service of the writ of garnishment and motions to dismiss for want of jurisdiction both the writ of garnishment and the direct claims against Pemex. In all of these motions, Pemex argued that it was immune from suit under the Foreign Sovereign Immunities Act of 1976. The district court denied the motions in a short interlocutory order from which Pemex appeals.[5]
 
 II. DISCUSSION
 
 9
 The doctrine of sovereign immunity has long roots in American jurisprudence. As early as 1812, the Supreme Court recognized that foreign sovereigns are immune from judicial process in the United States. In The Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), the venerable Chief Justice John Marshall remarked that sovereigns, as equal entities under international law and practice, have no authority over one another. Id. at 136. Although the opinion itself states nothing more than a narrow holding that the courts of the United States lack jurisdiction over an armed ship of a foreign state, The Schooner Exchange is generally regarded as the foremost expression of the concept of "absolute" sovereign immunity in American courts.
 
 
 10
 Over the years, however, Chief Justice Marshall's vision of absolute sovereign immunity engendered harsh and inequitable results. Particularly in commercial transactions with private parties, the doctrine of absolute sovereign immunity permitted foreign sovereigns to breach contractual relations with impunity. In the early years of the twentieth century, commentators advanced a "restrictive" theory of sovereign immunity designed to curb the inequitable effects of the mantle of immunity. Under the restrictive theory, sovereign immunity is limited to suits that arise from the foreign state's public acts; it does not extend to cases that arise from the state's strictly commercial acts. See Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 487, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983); Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation, 730 F.2d 195, 198 (5th Cir.1984). The United States Government formally adopted the restrictive theory of sovereign immunity in 1952. See Letter from Jack B. Tate, Acting Legal Advisor of the Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dep't of State Bull. 984 (1952).
 
 
 11
 The application of the restrictive theory proved troublesome. As in the past, the responsibility for resolving questions of sovereign immunity fell on the Executive acting through the State Department. However, in its attempt to accommodate political and diplomatic concerns, the State Department's immunity determinations proved inconsistent. At the request of both the State and Justice Departments, Congress intervened. In the Foreign Sovereign Immunities Act of 1976, Congress attempted to enact comprehensive legislation that would eliminate the role of the State Department in sovereign immunity determinations and provide a uniform statutory explication of the requirements for sovereign immunity. 28 U.S.C. Secs. 1602-1611 (1982 & Supp. V 1987).
 
 
 12
 The FSIA, however, is hardly a model of statutory clarity. While the Act states sweeping policy goals, it provides little guidance on specific situations that vary from the norm. The operative provisions of the FSIA are deliberately vague--leaving the courts to grasp for creative solutions to sticky questions of sovereign rights.[6] The instant appeal raises two such sticky questions: (1) whether the "commercial activities" exception to the FSIA applies to a foreign entity which has only nominal contacts with the United States relevant to the facts that created the plaintiff's cause of action, and (2) whether the FSIA affords an agency of a foreign nation sovereign immunity from the issuance of a writ of garnishment used to effect quasi in rem jurisdiction. As this appeal is interlocutory, it is necessary that this Court first explain the basis of its appellate jurisdiction.
 
 A. Appellate Jurisdiction
 
 13
 Stena argues that Pemex's appeal is improper because the district court's order is not an appealable final judgment. Although the district court's order denying Pemex's motions to dismiss Stena's action for want of jurisdiction is not a final judgment within the meaning of 28 U.S.C. Sec. 1291, it is appealable under the "collateral order" doctrine established in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The collateral order doctrine permits appellate review of certain district court orders that pose a "risk of important and probably irreparable loss if an immediate appeal is not heard." Acosta v. Tenneco Oil Co., 913 F.2d 205, 208 (5th Cir.1990) (citing EEOC v. Neches Butane Products Co., 704 F.2d 144, 148 (5th Cir.1983)). Several courts have determined that the collateral order doctrine authorizes immediate appeal of the denial of a claim of sovereign immunity under the FSIA. See, e.g., Rush Presbyterian-St. Lukes Medical Center v. The Hellenic Republic, 877 F.2d 574, 576 n. 2 (7th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 333, 107 L.Ed.2d 322 (1990); Compania Mexicana de Aviacion v. United States District Court, 859 F.2d 1354, 1358 (9th Cir.1988); Gould, Inc. v. Pechiney Ugine Kuhlmann & Trefimetaux, 853 F.2d 445, 450 (6th Cir.1988). These courts have recognized that the entitlement under the FSIA "is an immunity from suit rather than a mere defense to liability; it is effectively lost if a case is erroneously permitted to go to trial." Compania Mexicana de Aviacion, 859 F.2d at 1358.
 
 
 14
 Stena concedes that appellate review of Pemex's claim of sovereign immunity as a direct defendant is permissible. Stena argues, however, that this Court has no appellate jurisdiction to examine Pemex's claim of immunity from the garnishment of the debts Pemex owes Comision de Contratos, because this claim "turn[s] on factual issues which are not appealable of right." Stena's argument is flawed. This appeal raises no substantial factual issues that would require deference to the district court: the question whether the FSIA applies to a garnishment proceeding is essentially a legal issue. A reasoned resolution of Pemex's claim of sovereign immunity may require that this Court draw necessary factual conclusions, but the resolution of legal issues which are appealable under the collateral order doctrine often will entail some "consideration of the factual allegations that make up the plaintiff's claim for relief." Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). Any factual issues that the Court may encounter in the instant appeal will not be sufficient to deprive the Court of appellate jurisdiction.
 
 
 15
 B. "Commercial Activities" Exception to Sovereign Immunity
 
 
 16
 The FSIA states a general rule that foreign sovereigns are immune from the jurisdiction of the courts of the United States. 28 U.S.C. Sec. 1604 (1982 & Supp. V 1987).[7] Under the FSIA, a court in the United States can exercise subject matter jurisdiction over a foreign sovereign only if an exception to sovereign immunity applies. Id. Sec. 1330(a).[8] The Act recognizes sundry exceptions to the general rule of sovereign immunity. One of these is a broad "commercial activities" exception: foreign sovereigns are not immune from judicial process in any case in which the action is based upon commercial activity that has a jurisdictional nexus with the United States. Id. Sec. 1605(a)(2). The existence of subject matter jurisdiction under the FSIA is a question of law which this Court reviews de novo. See America West Airlines, Inc. v. GPA Group, Ltd., 877 F.2d 793, 796 (9th Cir.1989).
 
 
 17
 The commercial activities exception to sovereign immunity applies only if the sovereign's commercial activity has a sufficient connection--a "jurisdictional nexus"--with the United States. The FSIA identifies three types of acts which are sufficiently connected to the United States to satisfy the jurisdictional nexus requirement to the commercial activities exception:
 
 
 18
 (1) a commercial activity carried on in the United States;
 
 
 19
 (2) an act performed in the United States in connection with a commercial activity carried on outside the United States; and
 
 
 20
 (3) a commercial activity carried on outside the United States that has a direct effect in the United States.
 
 
 21
 28 U.S.C. Sec. 1605(a)(2). See Callejo v. Bancomer, S.A., 764 F.2d 1101, 1110 (5th Cir.1985); De Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1391 (5th Cir.1985).
 
 
 22
 A foreign sovereign, however, does not abrogate its sovereign immunity simply because it conducts commercial operations that have a connection with the United States. Not only must there be a jurisdictional nexus between the United States and the commercial acts of the foreign sovereign, there must be a connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign. Vencedora Oceanica Navigacion, 730 F.2d at 200. See also Gould, Inc., 853 F.2d at 452 ("there must be a connection between that [commercial] activity and the act complained of in the lawsuit); Joseph v. Office of the Consulate General, 830 F.2d 1018, 1023 (9th Cir.1987) ("In determining whether the commercial activity exception applies, the courts focus only on those specific acts that form the basis of the suit.") (emphasis in original), cert. denied, 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988); Arango v. Guzman Travel Advisors Corp., 621 F.2d 1371, 1379 (5th Cir.1980) (focus of the commercial activities exception is on "whether the particular conduct giving rise to the claim in question actually constitutes or is in connection with commercial activity, regardless of the defendant's generally commercial or governmental character."). In order to satisfy the commercial activities exception to sovereign immunity, the commercial activity that provides the jurisdictional nexus with the United States must also be the activity on which the lawsuit is based.
 
 
 23
 The requirement under the FSIA of a connection between the plaintiff's cause of action and the commercial acts of the foreign sovereign is a significant barrier to the exercise of subject matter jurisdiction in United States courts. We do not suggest that the commercial activities exception requires a direct causal connection. Vencedora Oceanica Navigacion, 730 F.2d at 200. Nonetheless, the connection between the cause of action and the sovereign's commercial acts in the United States must be material. Isolated or unrelated commercial actions of a foreign sovereign in the United States are insufficient to support a commercial activities exception to sovereign immunity. See America West Airlines, Inc., 877 F.2d at 797; Compania Mexicana de Aviacion, 859 F.2d at 1360; Alberti v. Empresa Nicaraguense de la Carne, 705 F.2d 250, 254 (7th Cir.1983).
 
 
 24
 In the instant case, Pemex does not dispute that it carried on commercial activity in connection with Comision de Contratos and the STENA SEAHORSE;[9] instead, it contends that there was no connection between Stena's causes of action and its commercial activity in the United States. We agree. All of the commercial activity relevant to Stena's claims for breach of contract and negligent misrepresentation occurred within the territorial boundaries of Sweden and Mexico. With one possible exception that this Court elects to ignore for other reasons,[10] the few commercial acts on which Stena relies for its argument that Pemex has no sovereign immunity are unrelated to the facts on which Stena relies for its causes of action. Because Pemex's commercial acts do not form the basis for Stena's complaints, the commercial activities exception does not apply. We consider in turn each of the forms of commercial activity that has a jurisdictional nexus with the United States.
 
 
 25
 Commercial activity in the United States. Stena asserts that its causes of action are based upon commercial activity carried on in the United States by the United Mexican States through its nationalized petroleum corporation. The FSIA defines commercial activity carried on in the United States by a foreign state as "commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. Sec. 1603(e) (1982). Without question, Pemex conducts commercial operations that have substantial contact with the United States. Pemex maintains offices and bank accounts in the United States; it purchases and charters a large amount of its equipment from United States businesses. Stena, however, has not adequately demonstrated that its causes of action are based upon any of Pemex's commercial operations in the United States. The fact that an agency of a foreign state has commercial operations in the United States in itself is inadequate to support a finding of subject matter jurisdiction under the FSIA. Callejo, 764 F.2d at 1110 n. 8; Vencedora Oceanica Navigacion, 730 F.2d at 202. The only relevant acts for purposes of jurisdiction under the FSIA are those acts that form the basis of the plaintiff's complaint. No adequate connection exists here between Stena's causes of action and Pemex's commercial activities in the United States.
 
 
 26
 Acts performed in the United States in connection with commercial activity elsewhere. Even if a foreign sovereign's commercial activities in the United States do not support jurisdiction under the FSIA, it is possible that the acts of the sovereign in the United States in connection with foreign commercial activity might give rise to subject matter jurisdiction in federal court. Stena alleges that three such acts by Pemex satisfy the requirements for a commercial activities exception to sovereign immunity: (1) the diversion of funds to a bank in Hidalgo, Texas; (2) the inducement of Stena to participate in failed settlement negotiations in McAllen, Texas; and (3) a visit to Brownsville by a Pemex representative, Captain Mendez Cid. We are unable to conclude, however, that these alleged acts are sufficient to deprive Pemex of its sovereign immunity.
 
 
 27
 We perceive that Stena has misunderstood the application of the second jurisdictional nexus of the commercial activities exception. Stena apparently contends that an American court may exercise subject matter jurisdiction if a foreign sovereign performs any act in the United States related to commercial activity elsewhere that causes the plaintiff's damages. The "commercial activity elsewhere" in the instant case is the series of events in Mexico and Sweden that includes the various charter agreements between the parties and the involvement of the STENA SEAHORSE in the Bay of Campeche platform repairs. This commercial activity undoubtedly has a material connection--and even a direct causal connection--with Stena's complaints. Any material connection between "commercial activity elsewhere" and the plaintiff's complaints, however, is irrelevant to the determination of subject matter jurisdiction in a court of the United States. Under the plain language of the FSIA, the plaintiff's action must be based upon the "act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. Sec. 1605(a)(2) (emphasis added). Thus, the material connection required by the commercial activities exception to sovereign immunity must exist between the plaintiff's cause of action and the act performed in the United States. See Gilson v. Republic of Ireland, 682 F.2d 1022, 1027 & n. 22 (D.C.Cir.1982).
 
 
 28
 While each of the "acts performed in the United States" Stena asserts as a basis for the commercial activities exception has at least a tangential relationship with the circumstances surrounding the hapless journey of the STENA SEAHORSE, the acts clearly do not form the basis for Stena's complaints. The diversion of funds to a Texas bank, for example, has no material connection with Stena's breach of contract claim. Stena might assert that a secret agreement between Pemex and Comision de Contratos to withhold funds from MSM constituted a breach of contract. Such a secret agreement, however, would have been formed in Mexico. The fact that the funds ultimately ended up in the United States is fortuitous. The diversion of funds serves at best only as some evidence of the existence of the secret agreement; in itself, it is attenuated from the totality of commercial circumstances that provide the basis for the cause of action. As an isolated event, we conclude that the alleged diversion of funds is insufficient to support the exercise of jurisdiction under the FSIA.
 
 
 29
 Similarly, the settlement negotiations in McAllen do not provide the basis for any of Stena's complaints. Settlement negotiations, by their very definition, occur after the inception of a cause of action. While perhaps a derivative of the cause of action, settlement negotiations have no material connection with the facts that create the cause of action. Indeed, such negotiations are wholly unrelated to any acts that would support the exercise of a court's jurisdiction. It would be senseless to predicate subject matter jurisdiction under the FSIA on the parties' choice of a mutually convenient site for discussions to avoid litigation.
 
 
 30
 The alleged visit to Brownsville by a Pemex representative is more troublesome.[11] Stena argues that a Pemex representative, Captain Mendez Cid, induced Stena officials in Brownsville to mobilize the STENA SEAHORSE. It is clear that this visit could not possibly have any material connection with Stena's breach of contract claim, and in fact, Stena does not so allege. The visit, however, could have a material connection with Stena's negligent misrepresentation claim. Any false statements Captain Mendez Cid made during the visit could provide the very foundation for Stena's claim. Such a causal relationship, although not required, generally will support the district court's exercise of jurisdiction under the FSIA, at least as to the claim in question. Even so, we are not inclined to authorize the district court's exercise of jurisdiction in the instant case.[12]
 
 
 31
 If the district court had concluded that Captain Mendez Cid's visit to Brownsville was an act in the United States in connection with foreign commercial activity sufficient to confer jurisdiction under the FSIA, this Court might have been obligated to affirm the district court's exercise of jurisdiction over Stena's negligent misrepresentation claim. It is apparent, however, that the district court did not reach such a conclusion. The record is entirely devoid of any suggestion that a Captain Mendez Cid made wrongful statements on Pemex's behalf in Brownsville, Texas.[13] Only on appeal does Stena argue for the first time that Captain Mendez Cid's actions in the United States afford a basis for jurisdiction under the FSIA, and even then the sole evidence offered to this Court of Captain Mendez Cid's visit is the assertion of Stena in its brief. We recognize that a party cannot waive subject matter jurisdiction by its silence, but this Court will not entertain the self-serving arguments of counsel on appeal as a basis for the solemn exercise of jurisdictional authority. After Pemex made a prima facie showing of FSIA protection, Stena "assumed a burden of going forward with some facts to show that an exception to immunity existed." Forsythe v. Saudi Arabian Airlines Corp., 885 F.2d 285, 289 n. 6 (5th Cir.1989).[14] Stena failed to fulfill this obligation. This Court cannot conclude that the available facts in the record are sufficient to support the commercial activities exception to sovereign immunity.
 
 
 32
 Commercial activity outside the United States that has a direct effect in the United States. Stena argues that the five million dollar financial loss it incurred as a result of the seizure of the STENA SEAHORSE in Mobile, Alabama, constitutes a "direct effect in the United States" that divests Pemex of its sovereign immunity. Citing a litany of cases, Stena maintains that a "direct effect in the United States" includes any financial loss suffered in the United States from a foreign state's commercial actions. Under particular circumstances, some courts--although not necessarily this Court--have indeed equated a "direct effect" with a corporate plaintiff's financial loss. See Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1004 (D.C.Cir.1985); Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 312 (2d Cir.1981) ("the relevant inquiry under the direct effect clause when plaintiff is a corporation is whether the corporation has suffered a 'direct' financial loss."), cert. denied, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). In each of these cases, however, the plaintiff was an American corporation. Stena is a Swedish corporation; any financial loss it has suffered affects Sweden, not the United States. Accordingly, at least for purposes of the instant case, financial loss alone is not an adequate measure of the effect of foreign commercial activities on the United States.
 
 
 33
 We rely instead upon a different expression of the direct effect standard. This Court, interpreting the nature of the "direct effect" for purposes of the FSIA, has previously determined that this clause of the commercial activities exception only reaches foreign conduct that causes a "substantial" and "direct and foreseeable" effect in the United States. Zernicek v. Brown & Root, Inc., 826 F.2d 415, 417-18 (5th Cir.1987), cert. denied, 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988). We are unpersuaded that Pemex's commercial activity in this case has caused a "substantial" and "direct and foreseeable" effect in the United States. The confiscation of the STENA SEAHORSE in Alabama, for instance, is not a substantial effect. Stena voluntarily intervened in the litigation relating to the arrest and sale of the STENA SEAHORSE and, through a sister corporation, successfully acquired the vessel and removed it from the United States. The short period of time in which the STENA SEAHORSE was moored in Alabama does not alone support the district court's exercise of jurisdiction.
 
 
 34
 Similarly, Stena's payment on the guaranty to the New York bank is not a substantial effect in the United States. Stena could have guarantied loans at any of a number of worldwide financial institutions. It voluntarily elected to guaranty its loan to MSM at a bank in the United States. The unilateral action of the plaintiff in the United States as a result of the foreign sovereign's commercial actions is insufficient to constitute a substantial "direct effect." See Maritime Internat'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1108 (D.C.Cir.1982) (citing Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)), cert. denied, 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983).[15] Moreover, Stena's payment on the guaranty to the New York bank is not a direct and foreseeable effect in the United States. Stena's voluntary decision to pursue a guaranty in New York was hardly foreseeable to Pemex, which was not directly privy to the transaction between Stena and MSM. At most, Pemex would have expected Stena to guaranty its loan at a Mexican or Swedish financial institution.
 
 
 35
 In sum, this Court cannot discern that Pemex acted in any way inconsistent with the grant of sovereign immunity under the FSIA. Pemex has conducted commercial operations in the United States, and Pemex has conducted commercial operations that have affected the United States. In the instant case, however, Pemex's commercial operations are not of sufficient import--both in relation to the territorial boundaries of the United States and Stena's causes of action--to support the district court's exercise of subject matter jurisdiction under the FSIA.
 
 C. Writ of Garnishment
 
 36
 Garnishment is a statutory remedy which may be used by a creditor to obtain satisfaction of an indebtedness out of credits of the defendant debtor in the possession of a third party, the garnishee.[16] In maritime cases, a creditor often may pursue a writ of garnishment solely for the purpose of obtaining quasi in rem jurisdiction over the credits and effects of a foreign debtor. See Day v. Temple Drilling Co., 613 F.Supp. 194, 197 (D.Miss.1985); Engineering Equipment Co. v. S.S. Selene, 446 F.Supp. 706, 710 (S.D.N.Y.1978). This procedural tactic, if effective, ensures that a creditor can easily and expediently secure satisfaction of the debt, even though the defendant debtor's "residence or place of business may be halfway around the world and the occurrence underlying the suit took place in some other district, or the high seas, or in a foreign country." Day, 613 F.Supp. at 197 (quoting 7A Moore's Federal Practice p 90 at 493). In many cases, however, the district court must deny the request for a writ of garnishment because it does not possess the authority to exercise quasi in rem jurisdiction.
 
 
 37
 Quasi in rem actions are based on a claim for money begun by attachment or other seizure of property when the district court has no jurisdiction over the person of the defendant, but has jurisdiction over either property that the court can apply to the satisfaction of the defendant's debt or persons who themselves owe an obligation to the defendant that the court can apply to the satisfaction of the debt. Belcher Co. of Alabama, Inc. v. M/V Maranatha Mariner, 724 F.2d 1161, 1163-64 (5th Cir.1984). In attachment cases, for example, the court may exercise quasi in rem jurisdiction to the extent that it has jurisdiction over an item belonging to the defendant. In garnishment cases, the court may exercise quasi in rem jurisdiction to the extent that it has jurisdiction "over a person who is indebted to, or owes a duty to the defendant." Id. at 1164.[17]
 
 
 38
 The district court in the instant case did not possess the requisite authority to exercise quasi in rem jurisdiction because it did not have personal jurisdiction over a person who is indebted to or owes a duty to the defendant Comision de Contratos. Pemex, the garnishee, does in fact owe a contractual duty to Comision de Contratos. The district court, however, could not obtain personal jurisdiction over Pemex. The FSIA is the sole basis for obtaining jurisdiction over an agency of a foreign state. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989). A court in the United States can exercise personal jurisdiction over an agency of a foreign state under the FSIA only if it has subject matter jurisdiction over the dispute and service of process is effected. 28 U.S.C. Sec. 1330(b). As we have explained, the district court cannot assert subject matter jurisdiction over the dispute because no exception to sovereign immunity applies. See 28 U.S.C. Sec. 1330(a). Pemex is an agency of a foreign state that is entitled to invoke the shield of sovereign immunity, whether against direct claims or an indirect writ of garnishment.
 
 
 39
 Stena argues that an admiralty garnishment proceeding is not an action against the creditor, but instead is an action against the debtor--in this case Comision de Contratos, which itself cannot rely upon any shield of sovereign immunity. According to Stena, a garnishment proceeding simply does not implicate the concerns of the FSIA where the agency of the foreign government stands in the shoes of a creditor. In our view, though, there can be no other conclusion except that the FSIA applies to garnishment proceedings. Stena desires to use a writ of garnishment as a means to prosecute its claims against a foreign party, Comision de Contratos, over which Stena could not otherwise obtain personal jurisdiction. If this Court were to authorize the use of garnishment against foreign governmental agencies with operations in the United States to prosecute claims against third parties, the agencies would be required repeatedly to appear in court to protect their own relations with the third parties. This result would be inconsistent with the spirit of grace and comity that underlies the doctrine of sovereign immunity. Verlinden B.V., 461 U.S. at 486, 103 S.Ct. at 1967.
 
 
 40
 In the absence of an applicable statutory exception, sovereign immunity under the FSIA remains the general rule. 28 U.S.C. Sec. 1604. There appears no compelling precedent or legislative history to suggest that the general rule should be abandoned in the instant appeal.[18] Accordingly, this Court concludes that the district court's exercise of quasi in rem jurisdiction through a writ of garnishment against Pemex was erroneous.
 
 III. CONCLUSION
 
 41
 After a painstaking review of the record and the law, this Court determines that Petroleos Mexicanos is immune from judicial process in the United States under the Foreign Sovereign Immunities Act of 1976. We reverse the judgment of the district court and remand with instructions that the district court dissolve the writ of garnishment and dismiss the claims against Pemex.
 
 
 42
 REVERSED AND REMANDED.
 
 
 
 [1]
 Callejo v. Bancomer, S.A., 764 F.2d 1101, 1107 (5th Cir.1985) (quoting Vencedora Oceanica Navigacion v. Compagnie Nationale Algerienne de Navigation, 730 F.2d 195, 205 (5th Cir.1984) (Higginbotham, J., dissenting))
 
 
 [2]
 Petroleos Mexicanos is an agency of the United Mexican States charged with the obligation to preserve, explore and produce Mexico's hydrocarbon resources. It is apparently the world's sixth largest crude oil producer and the world's fourth largest exporter of crude oil products
 
 
 [3]
 Pemex denies that its representatives ever negotiated with Stena for the mobilization of the STENA SEAHORSE
 
 
 [4]
 Stena sought the writ of garnishment pursuant to federal admiralty rules. See Fed.R.Civ.P., Supplemental Rules for Certain Admiralty and Maritime Claims Rule B, which provides in pertinent part:
 (1) When Available; Complaint, Affidavit, Judicial Authorization, and Process. With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, or credits and effects in the hands of garnishees to be named in the process to the amount sued for, if the defendant shall not be found within the district.
 Although this rule denominates the jurisdiction obtained through maritime garnishment as "in personam," the effect of a judgment is in the nature of quasi in rem unless the defendant is served with citation or enters an appearance in the action. Stevedoring Services of America v. Ancora Transport, N.V., 884 F.2d 1250, 1252 (9th Cir.1989).
 
 
 [5]
 The lawsuit never proceeded to trial
 
 
 [6]
 Rather than provide explicit direction on the scope of sovereign immunity, the Act comprehends that the federal courts will develop guidelines on a case-by-case basis. Callejo v. Bancomer, S.A., 764 F.2d 1101, 1107 (5th Cir.1985); Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 308-09 (2d Cir.1981), cert. denied, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982)
 
 
 [7]
 There is no question that Pemex is a "foreign state" for purposes of the FSIA. The Act defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. Sec. 1603(a) (1982)
 
 
 [8]
 The court in turn can exercise personal jurisdiction over the foreign sovereign if subject matter jurisdiction exists and statutory service of process is effected. 28 U.S.C. Sec. 1330(b). As with all suits, however, the exercise of personal jurisdiction must comport with the requirements of due process. Callejo, 764 F.2d at 1107 n. 5
 
 
 [9]
 The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. Sec. 1603(d) (1982). This circular definition has often troubled the courts. See, e.g., Joseph, 830 F.2d at 1023; Callejo, 764 F.2d at 1108 n. 6. At the very least, however, it is clear that commercial activity includes contract negotiations and contractual obligations. See Callejo, 764 F.2d at 1108-09. Both of these types of commercial activity are implicated in the instant case
 
 
 [10]
 See infra text accompanying notes 11-14
 
 
 [11]
 Stena characterizes Captain Mendez Cid's visit to Brownsville as a "commercial activity carried on in the United States." We treat it instead as an "act performed in the United States in connection with commercial activity elsewhere." Under the FSIA, commercial activity carried on in the United States must have "substantial contact with the United States." 28 U.S.C. Sec. 1603(e) (1982). See Maritime Internat'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1109 (D.C.Cir.1982) (" 'commercial activity carried on in the United States' must be substantial to support jurisdiction.") (quoting Verlinden B.V. v. Central Bank of Nigeria, 488 F.Supp. 1284, 1296 (S.D.N.Y.1980), aff'd on other grounds, 647 F.2d 320 (2d Cir.1981), rev'd on other grounds, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)), cert. denied, 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983). The FSIA does not impose a similar "substantial contact" requirement on acts performed in the United States in connection with commercial activity elsewhere. We do not intend to suggest in our emphasis on substantial contact that the term "commercial activity carried on in the United States" is limited to the kind of general business operations that we discussed supra at pages 387-388. A single contract or course of dealing executed within this nation's boundaries typically will constitute commercial activity carried on in the United States. See Callejo, 764 F.2d at 1108-09. In the instant situation, however, this Court cannot conclude that a single visit to Texas by a corporate representative constitutes substantial contact with the United States
 
 
 [12]
 In reaching this conclusion, we need not resolve the troublesome question whether the FSIA authorizes pendent claim jurisdiction; i.e., whether the FSIA permits the district court to exercise jurisdiction over all of the plaintiff's claims so long as the plaintiff can establish a commercial activities jurisdictional nexus to at least one of its claims
 
 
 [13]
 Stena argued in its sworn complaint that the commercial activities exception in the FSIA precluded Pemex's claim of sovereign immunity. The complaint, however, makes absolutely no reference to a Captain Mendez Cid. Indeed, the complaint suggests that one Ramon Betteta in Sweden made the statements that induced Stena to mobilize the STENA SEAHORSE. The record contains no evidence and reveals no affidavits that would tend to verify the Brownsville visit of Captain Mendez Cid. The only mention of Captain Mendez Cid in the record is a sentence in Plaintiff's Response to Pemex's Motions to Dismiss for Want of Subject Matter, Personal Jurisdiction and Under the Doctrine of Forum Non Conveniens to the effect that Captain Mendez Cid inspected the STENA SEAHORSE in the Texas port. Significantly, the plaintiff's response did not expressly contend that Captain Mendez Cid himself provided any false information to Stena officials
 
 
 [14]
 The party seeking immunity has no obligation to affirmatively eliminate all possible exceptions to sovereign immunity. Once a party demonstrates to the district court that it is a "foreign state" potentially entitled to immunity under the FSIA, the burden shifts to the opposing party to raise the exceptions to sovereign immunity and assert at least some facts that would establish the exceptions. Forsythe, 885 F.2d at 289 n. 6. Of course, the party seeking immunity bears the ultimate burden of proving the nonapplicability of the exceptions raised by its opponent. Id. See also Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1002 (D.C.Cir.1985); Vencedora Oceanica Navigacion, 730 F.2d at 199; Alberti, 705 F.2d at 253
 
 
 [15]
 Another circuit has determined, and we agree, that personal jurisdiction principles may shed light on the determination of sovereign immunity under the FSIA. Maritime Internat'l Nominees Establishment, 693 F.2d at 1108 & n. 20. In Hanson v. Denckla, the Supreme Court ruled that a plaintiff's execution of a power of appointment in a particular state was not a "substantial" connection for purposes of personal jurisdiction. 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." Id
 
 
 [16]
 To avoid confusion, we note that in this section Pemex is referred to as the "garnishee." Pemex is not considered the "defendant" for purposes of this section. When we use the terms "defendant" or "defendant debtor" in this section, we refer to Comision de Contratos
 
 
 [17]
 Constitutional due process concerns require a connection between the garnished debt (or attached property) and the subject matter of the action before a court can exercise quasi in rem jurisdiction. Rush v. Savchuk, 444 U.S. 320, 327-28, 100 S.Ct. 571, 576-77, 62 L.Ed.2d 516 (1980); Shaffer v. Heitner, 433 U.S. 186, 212, 97 S.Ct. 2569, 2584, 53 L.Ed.2d 683 (1977). Pemex does not argue, however, that there was an insufficient connection between its debt to Comision de Contratos and the subject matter of Stena's complaints. Pemex asserts simply that the district court did not have jurisdiction under the FSIA to impose a writ of garnishment. We therefore look only to whether the district court could impose a writ of garnishment on a garnishee over which it could not obtain jurisdiction under the FSIA
 
 
 [18]
 To the contrary, the very language of the FSIA suggests that a writ of garnishment, a form of attachment, does not abrogate the general rule of sovereign immunity. The FSIA expressly states that "the property in the United States of a foreign state shall be immune from attachment arrest and execution." 28 U.S.C. Sec. 1609. Property used for a commercial purpose may be attached prior to judgment in extremely limited circumstances: (1) the foreign state has explicitly waived its immunity from attachment prior to judgment, and (2) the purpose of the attachment is to secure satisfaction of a judgment against the foreign state. Id. Sec. 1610(d). See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A., 875 F.2d 1174, 1176-77 (5th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990); cf. Yugoexport, Inc. v. Thai Airways Int'l, Ltd., 749 F.2d 1373, 1375 (9th Cir.1984) (declining to authorize garnishment of the assets of an airline owned by the Royal Thai government in an action to enforce a default judgment against the Port Authority of Thailand), cert. denied, 471 U.S. 1101, 105 S.Ct. 2326, 85 L.Ed.2d 844 (1985). The narrow confines of the section 1610 exception exclude the common law rule that prejudgment attachment could be used to obtain quasi in rem jurisdiction. See Note, Proposed Amendments to the Provisions of the Foreign Sovereign Immunities Act of 1976 Governing Execution of Judgments, 23 Geo.Wash. J. Int'l L. & Econ. 179, 184 (1989)
 We are not inclined to find these sections 1609 or 1610(d) dispositive because we conclude that they generally apply only to situations in which the foreign state is a defendant debtor and not necessarily a garnishee. Nonetheless, to the extent these sections express an intent to avoid intrusion on a foreign state's property or contract rights simply to effect quasi in rem jurisdiction in American courts, we find them persuasive.