United States Court of Appeals
Fifth Circuit

**F I L E D**

July 10, 2006

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 04-20965 and No. 05-20042

FG HEMISPHERE ASSOCIATES, LLC,

Plaintiff-Appellee,

versus

THE RÉPUBLIQUE DU CONGO,

Defendant-Appellant,

CMS NOMECO CONGO, INC.;
CMS OIL & GAS (SERVICES) CO.;
NUEVO CONGO CO.;
NUEVO CONGO, LTD.,

Garnishees-Appellants.

FG HEMISPHERE ASSOCIATES, LLC,

Plaintiff-Appellee,

versus

THE RÉPUBLIQUE DU CONGO,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FG HEMISPHERE ASSOCIATES, LLC,

Plaintiff-
Appellee,

versus

REPUBLIQUE DU CONGO,

                                                        Defendant-
Appellant,

CMS NOMECO CONGO INC.;
NUEVO CONGO CO.;
NUEVO CONGO LTD,;

                                                        Garnishees-
Appellants.

_____

FG HEMISPHERE ASSOCIATES LLC.;

                                                        Plaintiff-
Appellee,

versus

THE REPUBLIQUE DU CONGO;

                                                        Defendant-
Appellant.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

Before BARKSDALE, STEWART, and CLEMENT, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Before the court are two interlocutory appeals challenging three district court orders authorizing execution against property of a foreign sovereign, the République du Congo ("the Congo"), and Société Nationale des Pétroles du Congo ("SNPC"), an oil company owned by the

2

Congo. To satisfy its money judgment against the Congo, FG Hemisphere, LLC, filed suit against CMS Nomeco Congo Inc., The Nuevo Congo Co., and Nuevo Congo Ltd. (collectively "the Garnishees"), and the Congo and SNPC. In the first appeal, No. 04-20965 ("*FG Hemisphere I*"), the Garnishees challenge two October 2004 orders that authorized the execution in favor of FG Hemisphere against the Congo's right to receive in cash or in-kind royalties from the Garnishees, in exchange for allowing them to drill for oil in Congolese waters. In the second appeal, No. 05-20042 ("*FG Hemisphere II*"), the Congo and the Garnishees challenge a December 2004 order authorizing the issuance of garnishment writs in favor of FG Hemisphere against SNPC's right to receive a 12.5% working interest share of oil produced in the Congo. We consolidated the appeals for oral argument and, due to the overlapping issues presented in the appeals, we also consolidate them for disposition.

The Congo and the Garnishees (collectively "the Congo Defendants") appeal, arguing in *FG Hemisphere I* that it was error for the district court to authorize execution against the interest in royalties without a prior determination that the property met the Foreign Sovereign Immunities Act ("FSIA") requirements for an exception to the Congo's sovereign immunity from execution. In *FG Hemisphere II*, the Congo Defendants argue that SNPC's working interest share is not a "debt obligation" and that SNPC's right to receive working interest oil is immune from garnishment under the FSIA. The Congo Defendants also assert that, at the time of the challenged orders, the property was not in the United States and therefore, pursuant to the FSIA, could not be garnished.

To resolve each appeal, we must decide this *res nova* issue: at what point in time does property have to be in the United States for a court to determine whether the exception to the Congo's sovereign immunity from execution applies? We conclude that (1) the foreign sovereign's property must be in the United States when the district court determines whether the exception

3

applies, and (2) prior to authorizing execution, the district court must find the facts necessary for the exception to apply. We further conclude in each appeal that the district court misapprehended the effect of applying the exception to immunity, and that the challenged writs of garnishment issued as a direct result of a misinterpretation and misapplication of law. Accordingly, we reverse the October and December 2004 orders and remand with instructions that the district court dissolve the writs of garnishment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1982 the Congo entered into a loan agreement with Banco do Brasil S.A. FG Hemisphere is the owner of the rights of Banco do Brasil under that loan agreement. The Congo subsequently defaulted and FG Hemisphere obtained a judgment against the Congo in the Southern District of New York. In the loan agreement, the Congo expressly waived its right to immunity from execution.

### A. The Congo's Royalty Interest and SNPC's Working Interest Share

FG Hemisphere sought to satisfy its money judgment against the Congo via garnishment of royalty obligations under which the Garnishees periodically deliver oil that is produced, stored, and delivered in Congolese territorial waters. The royalty obligations arose under a 1979 agreement ("the Convention"). The parties to the Convention were the Congo, Congolese Superior Oil Company, Cities Service Congo Petroleum Corporation, Canadian Superior Oil, Ltd., and Société Nationale de Recherches et d'Exploitation Pétrolières "Hydro-Congo." It appears that the Garnishees are successors in interest to three of these parties, with SNPC being the successor to Hydro-Congo.

Pursuant to the Convention, the Congo issued a permit, the Marine 1 permit, allowing the companies to drill for oil in exchange for royalties paid to the Congo. Under the Convention, the Congo has the right to elect to receive royalties in cash or in-kind, but since 1999, the Congo has

4

elected to receive the payments in-kind. The Garnishees and SNPC are the current owners of working interests in the Convention.

The rights and obligations of the parties to the agreement are governed by a series of contracts. The Joint Operating Agreement ("JOA"), a separate agreement among the working interest owners, sets forth their respective proportionate interests and also provides for how the oil production operations are conducted. The parties to the JOA were all the parties to the Convention except the Congo. A related agreement, the Amendment to Lifting Agreement, establishes the logistical procedures to coordinate oil liftings taken by SNPC and the Garnishees. The oil produced pursuant to the Convention is transported via a subsurface pipeline network to an offshore vessel located off the coast of the Congo.

A "lifting" occurs when oil is offloaded from a storage vessel located off of the Congo's coast. The Garnishees take liftings of oil stored on the vessel for their own account and sell 100% of the oil for their own account. CMS Nomeco Congo, Inc. ("CMS Nomeco"), as operator, calculates the royalty owed to the Congo and the working interest amount owed to SNPC as a result of the Garnishees' liftings. These amounts owed to the Congo and SNPC are called "the under-delivered position." CMS Nomeco records the results of its calculations on an "over/under statement." Once the combination of the Congo's royalty entitlement and SNPC's working interest entitlement exceeds an under-delivered position of at least 275,000 barrels, SNPC is entitled to take a lifting of oil for itself and for the Congo. Apparently, when SNPC conducts such a lifting, it lifts about 550,000 to 650,000 barrels, at which point it is "over-delivered," which is then accounted for in the over/under statement described above. *Af-Cap Inc. v. Republic of Congo*, ("*Af-Cap II*")[1] 383 F.3d 361, 365 n.2,

---

[1]*See* citation and discussion of *Af-Cap I infra* Part II. B, n.2 and accompanying text.

*clarified on reh'g, Af-Cap, Inc. v. Republic of Congo*, 389 F.3d 503 (5th Cir. 2004). SNPC would then not take another lifting until it is under-delivered by 275,000 barrels. In this manner, the SNPC lifting extinguishes the in-kind royalty obligation and puts SNPC into an over-delivered position. The process repeats as the Garnishees take more liftings.

The oil production operations entail operating costs that are borne by the working interest owners, which do not include the Congo. Pursuant to the JOA, the Garnishees advance SNPC's share of the operating expenses. These advances are reimbursed by allocation of a portion, 75%, of SNPC's 50% working interest share of the production. Accordingly, SNPC takes only 25% of its 50% share of the production, 12.5% of the total production. The remaining 75% of SNPC's share, or 37.5% of the total production, is lifted by the Garnishees to reimburse themselves for the amounts paid to cover SNPC's share of the operating costs. Through these various agreements, the working interest owners established a procedure for the lifting of the Garnishees' share of the oil as well as the lifting of SNPC's working interest share, which it takes at the same time it takes the Congo's royalty oil.

B. Location of The Garnishees and Their Predecessors

In May 2002, CMS Oil and Gas Co. and its subsidiary CMS Oil and Gas (International) Co., and subsidiaries of those companies, owned exploration and production assets in the United States, the Congo and various other countries. In July 2002, CMS Oil and Gas Co.'s parent company signed a purchase and sale agreement for the stock of CMS Oil and Gas (International) Co. along with its subsidiary, CMS Nomeco, to be sold to affiliates of Perenco S.A. Perenco S.A. and its affiliated companies, including the Garnishees, are headquartered in Europe.

In September 2002, CMS Nomeco, a Delaware corporation, became a member of the Perenco group of companies with officers and directors located in Paris and London. Operations relating to

6

the Congo that previously had been performed in the United States were performed in the Congo. In July 2004, Nuevo Congo Ltd. and Nuevo Congo Co. became members of the Perenco group of companies. Nuevo Congo Ltd. is incorporated in the Cayman Islands and Nuevo Congo Co. is incorporated in Delaware. By July 2004, none of the Garnishees had operations, officers, or a physical presence in the United States.

C. The Writs of Garnishment

On September 17, 2004, we decided *Af-Cap II*. There, another of the Congo's judgment creditors sought to garnish the same royalty obligations FG Hemisphere seeks to garnish in this case. We found that the royalty obligations were not immune to execution and reversed the district court's decision to the contrary. One week after our *Af-Cap II* decision, FG Hemisphere filed an Emergency Application to Issue Writs of Garnishment, asking the district court to issue writs of garnishment directed to the royalty obligations.

On October 5, 2004, the district court granted this emergency application, finding only that "a valid judgment exists against the Republique du Congo that is unchallenged, that the Republique du Congo irrevocably waived immunity with respect to the obligations of the Loan Agreement, and that the waiver extends to any assets, revenues and properties that belong to the Republique du Congo." That same day, writs of garnishment issued against the Garnishees as to "any assets and other property of the Republique du Congo of any nature including any payments or obligations due to the Republique du Congo, whether denominated as taxes, fees, royalties, net profits, or otherwise."

FG Hemisphere filed a motion to "clarify" the October 5, 2004, order and to abandon portions of the previously-granted garnishment regarding certain tax obligations. Specifically, this motion asked the district court to modify the order to (1) "include a determination that the royalty obligations

7

at issue in FG Hemisphere's Emergency Application are not immune from execution under the FSIA because they constitute property of the Republique du Congo located in the United States, which has been used for commercial activity in the United States," and (2) "order that the writs of garnishment issued in accordance with the Order do not relate to the bona fide obligation of the Garnishees to pay taxes to the Congo and are modified to exclude such tax obligations."

The district court granted this motion and, on October 22, 2004, modified and restated its earlier order:

> The Court has reviewed the application and the defendants' response, and determines that a valid judgment exists against the Republique du Congo that is unchallenged, that the Republique du Congo irrevocably waived immunity with respect to the obligations of the Loan Agreement, and that the waiver extends to any assets, revenues and properties that belong to the Republique du Congo. The Garnishees owe to the Republique du Congo certain royalty obligations under a 1979 Convention for the production of oil. Based on the plaintiff's emergency application for the issuance of writs of garnishment and the Garnishees response thereto, the Court determines that said royalty obligations constitute property of the Republique du Congo located in the United States, which has been used for commercial activity in the United States, therefore, satisfying the requirements of the Foreign Sovereign Immunities Act and enabling the plaintiff to execute on said property.

In December 2004, FG Hemisphere filed an emergency application for writs of garnishment addressed to SNPC's working interest. The district court reasoned that the Garnishees advance operating expenses to SNPC via a transaction that functions like a revolving loan, and found SNPC's working interest share to be a species of a previous commercial-purpose determination. The court further held that the Congo had waived the defenses that might be asserted under the FSIA. The district court found that the Garnishees held assets for the Congo in the United States when this action commenced. Finally, the court determined that the obligations owed by the Garnishees to SNPC had a commercial purpose and were located in the United States. On December 23, 2004, the

district court held that SNPC's working interest share was not immune from execution under the FSIA and that, therefore, FG Hemisphere was entitled to execute against this property. As with the October 5, 2004 order, writs of garnishment issued against SNPC's property on the same day as the December 2004 order.

The Congo Defendants appeal the district court's October and December 2004 orders granting FG Hemisphere's applications for writs of garnishment against them.

## II. APPLICABLE LAW

### A. Standard of Review

In reviewing a district court's conclusion that the FSIA permits execution against a foreign state's property we review the district court's factual findings for clear error, and its legal conclusions and application of law to fact de novo. *Af-Cap II*, 383 F.3d at 368. "The existence of subject matter jurisdiction under the FSIA is a question of law which this Court reviews de novo." *Stena Rederi AB v. Comisión de Contratos del Comité Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la República Mexicana, S.C.*, 923 F.2d 380, 386 (5th Cir. 1991). To the extent that the "property in the United States" and commercial-purpose determinations are questions of the sufficiency of evidence, review is de novo. *See Walker Int'l Holdings, Ltd. v. Republic of Congo* (*Walker Int'l I*) 395 F.3d 229, 237 (5th Cir. 2004) ("Reviewing the sufficiency of evidence is the application of law to facts and is reviewed de novo.").

### B. The FSIA Immunity From Execution Against Property

The FSIA sets forth the sole and exclusive standards used by courts in the United States to resolve sovereign immunity issues. *Walker Int'l Holdings, Ltd. v. Republic of Congo* (*Walker Int'l II*) 415 F.3d 413, 416 (5th Cir. 2005). "[A] claim of sovereign immunity . . . merely raises a

9

jurisdictional defense." *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004). The sovereign immunity claim may be raised by a garnishee as well as by a foreign sovereign. *See Walker Int'l I*, 395 F.3d at 233 (finding "[no] authority for the proposition that it is the sovereign's *exclusive* right to raise the issue of sovereign immunity under the FSIA," and concluding that "28 U.S.C. § 1610(a) . . . [does not] give[] the sovereign exclusive standing to raise the waiver element"). The district court's denial of immunity under the FSIA is immediately appealable under the collateral order doctrine. *See Byrd v. Corporación Forestal y Indust. de Olancho, S.A.*, 182 F.3d 380, 385 (5th Cir.1999); *Stena*, 923 F.2d at 385.

The general rule under the FSIA is that property of a foreign sovereign is immune from attachment and execution. 28 U.S.C. § 1609 (2000 ed. & Supp. III); *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1176-77 (5th Cir. 1989). The exceptions to the general rule of immunity are central to the FSIA's functioning. *Republic of Austria*, 541 U.S. at 691. "At the threshold of every district court action against a foreign state, the court must satisfy itself that one of the exceptions applies [because its] subject-matter jurisdiction . . . depends on that application." *Id.* (alteration and internal quotation marks omitted). One of the exceptions is § 1610(a)(1):

> The *property in the United States* of a foreign state, as defined in section 1603(a) of this chapter, *used for a commercial activity in the United States*, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if . . . the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication . . . .

28 U.S.C. § 1610 (2000 ed. & Supp. III) (emphasis added); *Atwood*, 875 F.2d at 1176-77. This section simply determines whether property belonging to a foreign sovereign is immune from execution by a state or federal court in the United States; it does not provide a cause of action for

10

execution against such property. *See Conn. Bank of Commerce v. Republic of Congo* (*Af-Cap I*), 309 F.3d 240, 247 (5th Cir. 2002)[2] (noting that the FSIA provides foreign sovereigns with immunity from execution against their property to satisfy an adverse judgment); *Walker Int'l II*, 415 F.3d at 416 ("[T]he FSIA does not create an independent cause of action. . . . [Instead, i]t simply provides a defense to claims raised against a sovereign, and a federal forum for the resolution of such claims." (citation omitted)); *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 620 (1983) ("[The FSIA] was not intended to affect substantive law determining the liability of a foreign state.").

Under § 1610(a), even when the foreign sovereign has waived its immunity from execution, courts in the United States may execute only against "property in the United States" that is "used for commercial activity in the United States." *Af-Cap I*, 309 F.3d at 247, 251 (quoting 28 U.S.C. § 1610(a)). In *Af-Cap I* and *Af-Cap II*, we assumed without deciding that, for purposes of determining the § 1610(a) "in the United States" requirement, the obligations to pay royalties to the Congo were intangible debt obligations. *See* discussion *infra* Part II.C.2.

> [Intangible] rights are but relationships between persons, natural or corporate, which the law recognizes by attaching to them certain sanctions enforceable in courts. The power of government over them and the protection which it gives them cannot be exerted through control of a physical thing. They can be made effective only through control over and protection afforded to those persons whose relationships are the origin of the rights.

---

[2]Af-Cap, Inc. is successor in interest to Connecticut Bank of Commerce regarding the judgment against the Congo that is the basis for the writs of garnishment sought in *Af-Cap I* and *Af-Cap II*. In *Af-Cap I*, we remanded the matter to the district court. In *Af-Cap II*, we reversed the district court's holding that the instant royalty obligations did not satisfy the § 1610(a) "used for commercial activity in the United States" requirement.

*Curry v. McCanless*, 307 U.S. 357, 365-66 (1939). "To say that 'a debt follows the debtor' is simply to say that intangible property has no actual situs, and a debt may be sued on wherever there is jurisdiction over the debtor." *Rush v. Savchuk*, 444 U.S. 320, 330 (1980). In contrast to a suit against the debtor, a garnishment proceeding "is operative *in personam* against the garnishee to prevent him from paying the debt to the garnishment debtor and is operative *in rem* upon the *property of the defendant debtor in the hands of the garnishee.*" *Matter of T.B. Westex Foods, Inc.*, 950 F.2d 1187, 1192 n.7 (5th Cir. 1992) (internal quotation marks omitted). Thus, garnishment is a *quasi in rem* action in which "the plaintiff seeks to apply what he concedes to be the property of the defendant to the satisfaction of a claim against him." *Shaffer v. Heitner*, 433 U.S. 186, 199 n.17, 212 n.38 (1977) (internal quotation marks omitted).

C. Applicability of *Af-Cap I* and *Af-Cap II*

The Garnishees assert that the FSIA requires that a court determine that a foreign sovereign's property meet the requirements for an exception to immunity before authorizing execution against such property. They complain that instead of making the required determinations, the district court merely decided that *Af-Cap II* was conclusive on the immunity issue, and argue that this exclusive reliance on *Af-Cap II* was error. FG Hemisphere counters that *Af-Cap II* settles the immunity issue because the Garnishees were located in the United States when this case was removed to the district court.

The *Af-Cap II* holding that the situs of the garnishee is the situs of the property is instructive regarding our focus on the Congo's intangible property. Nevertheless, we distinguish *Af-Cap II* on its facts and reasoning because the *Af-Cap II* panel did not make the determinations there that are essential to the issues in this case.

12

1. *The Garnishees' Situs Was Not At Issue In* Af-Cap I *and* Af-Cap II

In *Af-Cap I* and *Af-Cap II*, we examined the same royalty obligations that FG Hemisphere seeks to garnish in this case and determined that "a common sense appraisal of the requirements of justice and convenience in this particular context yields the conclusion that the situs of these royalty obligations is the United States—the situs of the Garnishees." *Af-Cap II*, 383 F.3d at 371 (internal quotation marks omitted). On the *Af-Cap I* and *Af-Cap II* record, it was undisputed that Texas was the locus from which the garnishees had supervised, directed, and financed the activities that gave rise to their obligations to make royalty payments to the Congo. *Af-Cap I*, 309 F.3d at 262-63 (Dennis, J., dissenting from denial of rehearing en banc).

Also undisputed was the Garnishees' continuous presence in Texas. *Id.* Accordingly, *Af-Cap I* and *Af-Cap II* did not consider either (1) *whether* the garnishees–and therefore intangibles in their possession–were in the United States, or (2) the applicable time period during which the obligations must be in the United States for § 1610(a) purposes (the "§ 1610(a) situs snapshot," or the "situs snapshot"). *See Af-Cap II*, 383 F.3d at 371-73 (discussing the rule applicable to a § 1610(a) situs determination for intangibles but not discussing the situs of the garnishees).

2. *Classification of the Royalty Interests Was Not At Issue In* Af-Cap I *and* Af-Cap II

In *Af-Cap I*, we assumed that the obligations were intangible property; in *Af-Cap II*, we stated that the royalty obligations were intangibles. Nevertheless, neither *Af-Cap I* nor *Af-Cap II* analyzed the nature of the property, in large part because *Af-Cap I* and *Af-Cap II* addressed only the FSIA exception to executional immunity. Neither *Af-Cap I* nor *Af-Cap II* mentioned statutory or jurisprudential support–or considered the record's factual support–for the assumption and conclusion that these obligations were intangible property.

13

For example, the word "intangible" first appears in *Af-Cap I* as follows: "Contrary to the Bank's suggestion, assigning the phrase 'used for' its ordinary meaning does not make it impossible to execute against the intangible property of the foreign state." *Af-Cap I*, 309 F.3d at 257. Next, we noted that Af-Cap, Inc.'s predecessor in interest, Connecticut Bank of Commerce "suggests that, because it is difficult to prove what a foreign state intends to do in the future with intangible property, like bank accounts, judgment creditors will rarely be able to execute against any intangible property." *Id.* (footnote omitted).

Continuing to refer generally to intangible property, we examined the meaning of "used for" in § 1610(a)'s "used for commercial activity in the United States" requirement, noting that "we cannot see how focusing on the use of property forecloses execution against intangible property. Our decision in *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir. 1989), helps illustrate how certain intangible property can uncontroversially be viewed as used in service of a commercial activity in the United States." *Af-Cap I*, 309 F.3d at 258. We concluded that intangible property is not so inherently speculative that courts cannot determine how such interests are used by the foreign state. *Id.*

The *Af-Cap I* panel first associated "intangible" with the Congo's royalty interest in an observation that, "[o]n the record before us . . . the Congo has not put its intangible property in the service of any commercial activity in the United States." *Id.* at 258. The second such association was a finding that, "[u]nder the undisputed facts, the property executed upon–the garnishees' intangible obligations to pay royalties–are in the United States, as required by FSIA § 1610(a). The garnishees are oil companies headquartered in Texas. The situs of a debt is the situs of the debtor in Texas." *Id.* at 261-62 (Dennis, J., concurring in the judgment but disagreeing as to the controlling principles of

14

law). Next is a statement that "[t]he factual question of what the royalty and tax obligations are 'used for' appears much less difficult on this record than the legal question of determining the situs of the intangible royalty obligations." *Id.* at 265. Our focus in *Af-Cap I* was the "interest entitling its owner to a share" as part of the § 1610(a) "used for commercial activity" requirement–not the classification of that interest.

In *Af-Cap II*, we confirmed the *Af-Cap I* assumption that the royalty obligations are intangibles, and determined that the situs of an intangible obligation is the situs of the garnishee. Whether the royalty obligations were classified as intangibles or otherwise was not squarely part of our analysis. The panel in *Af-Cap II* determined whether the obligation to pay royalties, assumed in *Af-Cap I* and *Af-Cap II* to be intangible, was "in the United States," given the uncontroverted fact that the garnishees were in the United States.

Finally, the Congo's royalty interests, but not SNPC's working interest, was at bar in both *Af-Cap I* and *Af-Cap II*. There has been no appellate determination that the working interest satisfies either requirement for application of the § 1610(a) exception to execution immunity.

To sum up: In the *Af-Cap* cases, we decided that (1) the obligations to pay royalties to the Congo, here at issue in *FG Hemisphere I*, had been "used for commercial activity in the United States"; and (2) as to these intangible obligations to pay royalties, the undisputed United States situs of the garnishees was the § 1610(a) situs of the Congo's intangible property. In *FG Hemisphere I* and *FG Hemisphere II*, we are not faced with a straightforward application of law to undisputed fact, as was the case in *Af-Cap II*. To properly apply the *Af-Cap II* § 1610(a) situs rule in each of these two appeals, it must be determined *when* the property must be in the United States; whether the obligations at issue are intangible; and whether SNPC's working interest was "property in the United

15

States" that was "used for commercial activity in the United States." Our *Af-Cap* decisions do not speak to these determinations. As in the *Af-Cap* decisions, we do not analyze whether the property at issue in either appeal is classified as tangible or intangible. Moreover, because the garnishment writs against SNPC must be dissolved for other reasons, we do not address whether SNPC's working interest share satisfies the requisites of § 1610(a). In contrast to the *Af-Cap* decisions, the facts disputed in both appeals require that we determine the § 1610(a) time period during which the obligations must be in the United States.

## III. DISCUSSION

We first address the "situs snapshot" question, at issue in both appeals, then address the issues that remain in each appeal.

The Congo Defendants contend that the § 1610(a) situs snapshot should be taken when the writs of garnishment issue. In contrast, FG Hemisphere argues that the situs determination should be made either when the suit commenced or when the Garnishees received notice of the garnishment action against them. We find that for purposes of § 1610(a), the foreign sovereign's property must be in the United States when the district court applies the exception to immunity from execution.

A. The 28 U.S.C. § 1610(a) "Situs Snapshot"

In *FG Hemisphere I*, the Congo Defendants challenge the October 5, 2004, order, asserting that the district court erred by granting the writ application without making a determination that the Congo's royalty interest was located in the United States, as required by the FSIA § 1610. The Congo Defendants also assert that the district court erred in its subsequent finding that the property was in the United States because neither the Congo nor the Garnishees had property "in the United States" when the October 2004 writs issued. Similarly, in *FG Hemisphere II*, the Congo Defendants

16

challenge the district court's December 2004 order that writs issue against the Garnishees' obligation to pay SNPC's working interest, asserting that the working interest was neither garnishable property nor was it property "in the United States" for purposes of § 1610(a).

FG Hemisphere, on the other hand, asserts that the Garnishees or their predecessors were located in the United States at the commencement of this suit and/or when the Garnishees received notice of the garnishment action against them. Therefore, it contends, under *Af-Cap II*, the intangible obligations at issue were situated in the United States. According to FG Hemisphere, this satisfied the § 1610(a) "in the United States" requirement because the royalty obligation and the obligation to pay SNPC's working interest share are intangible property rights that were in the United States for purposes of § 1610(a).

FG Hemisphere also argues that the situs of both the royalty obligations and working interest share obligations is presently, and has been, "in the United States" for purposes of § 1610(a) because the Congo Defendants subjected themselves to personal jurisdiction via their removal of this action from Texas state court and via defending this case on the merits, and because two of the Garnishees are incorporated in Delaware and are therefore legally present in the United States.

While this court has previously addressed the time period applicable to the "used for commercial activity" requirement for this exception to immunity, there has been little said in this or any other Circuit about exactly when the property has to be in the United States. Perhaps this is because generally, as in the *Af-Cap* cases, there was no dispute about the location of the property or the location of the Garnishees when the garnishment order issued; or perhaps it is because the language of § 1610(a) suggests a present tense for the "property in the United States" factual determination.

17

The operative language in § 1610(a) states: "property in the United States of a foreign state . . . shall not be immune from attachment in aid of execution, or from execution." This language suggests that the property must be in the United States at the time of the immunity determination. Garnishment is a *quasi in rem* proceeding used by a creditor to reach property of the debtor that is in the possession of a third party, the garnishee. *Stena*, 923 F.2d at 391. In Texas, the writ of garnishment applies to debt obligations the garnishee owes to the debtor and property belonging to the debtor but in the garnishee's possession, from the time the garnishee is served with the writ of garnishment to the time the garnishee must answer the writ. Tex. R. Civ. P. 659.

Writs of attachment or garnishment usually target either property that is in the jurisdiction of the court or that is in the possession of a garnishee who is within the jurisdiction of the court. *See Stena*, 923 F.2d at 391-92. The FSIA statute does not say *property that was in the United States* or *property that has been in the United States*. A common sense appraisal of the requirements of justice and convenience in this particular context yields the conclusion that the situs snapshot is taken when the court makes the § 1610(a) situs determination. *Cf. Af-Cap II*, 383 F.3d at 371 ("[A] common sense appraisal of the requirements of justice and convenience in this particular context yields the conclusion that the situs of these royalty obligations is the United States-the situs of the Garnishees.") (internal quotation marks omitted). Stated differently, to satisfy the § 1610 exception to immunity, the property must be in the United States when the district court authorizes execution. This result best prevents disruption of the public acts of foreign sovereigns by not garnishing property that *was* in the United States but is now exclusively in a foreign country.

FG Hemisphere also argues that the Garnishees' presence in the United States has been continuous because they have remained subject to the jurisdiction of the district court throughout this

18

litigation and because two of the Garnishees are incorporated in Delaware. Although jurisdiction over the parties does not change after the action commences or after the party submits to the court's jurisdiction, "immunity from execution is nevertheless narrower than jurisdictional immunity." *Af-Cap I*, 309 F.3d at 252 (noting that the Second Circuit examined the history of immunity from execution and the international law context at the time Congress passed the FSIA and determined that Congress deliberately chose to narrow the scope of immunity from execution) (citing *DeLetelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984)). We reject FG Hemisphere's argument because it conflates the considerations and effects attendant to commencement and/or notice of a suit seeking to execute upon the foreign sovereign's property with those attendant to deciding whether to authorize execution upon that property.

To show the importance of commercial use rather than diplomatic use for property to be subject to attachment under § 1610(a), *Af-Cap I* uses an example of an airplane owned by a foreign state that lands in the United States. *See Af-Cap I*, 309 F.3d at 253. Drawing on that analogy, a foreign state's airplane that landed in the United States would not be "property in the United States" once it left the United States. Likewise, tangible property that was in the United States at the onset of litigation, or when notice of the litigation was received, but was not there when a writ of garnishment was requested, issued, or served would not be considered "property in the United States" for purposes of garnishment.

Applying the *Af-Cap II* rule that the situs of intangible property is the situs of the garnishee, we conclude that the relevant inquiry is whether the garnishee is in the United States when the court makes its jurisdictional determination whether an exception to the FSIA immunity applies to the foreign sovereign's property.

19

We decline FG Hemisphere's invitation to fashion a situs snapshot that allows the § 1610(a) exception to immunity to apply simply because the legal fiction of intangible property's situs is deemed to be in the United States at a time when tangible property would not be "property in the United States." Like the airplane, the § 1610(a) situs of tangible property is its location when the court determines whether it is immune from execution. Similarly, under *Af-Cap II*, the situs of intangible property is the location of the garnishee when the immunity determination is made.

We need not determine whether any Garnishee was in the United States when the district court granted FG Hemisphere's applications for writs of garnishment because the garnishment writs must be dissolved. Moreover, we express no opinion whether the Delaware incorporation of a Garnishee is, alone, sufficient to satisfy the § 1610(a) location in the United States requirement.

B. *FG Hemisphere I*: Findings Necessary Under the FSIA

In *FG Hemisphere I*, the Congo Defendants argue that the district court erred in determining that the FSIA's general rule of immunity does not apply to the royalty obligations without first conducting an analysis of whether these obligations were "in the United States."

Unlike the initial order that authorized execution against the Congo's royalty interests, the district court's October 22, 2004 order included factual findings and legal conclusions that (1) the Congo waived its immunity to attachment and execution of judgment as to the Congo property and rights to royalties owed by or in possession of the Garnishees; (2) the Garnishees owe certain royalty obligations to the Congo; (3) these royalty obligations are property of the Congo in the United States; and (4) these royalty obligations have been used for commercial activity in the United States.

The district court must apply the FSIA in each action against a foreign sovereign because the court's subject-matter jurisdiction in any such action depends on the existence of one of the specified

20

exceptions to foreign sovereign immunity. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-35 (1989). In *FG Hemisphere I*, this means that there must be a determination that the obligation to pay the royalty interest conforms to the two § 1610(a) requirements before the district court has subject matter jurisdiction. These two requirements cannot be waived because they are jurisdictional. *See Republic of Austria*, 541 U.S. at 688-89, 700 (discussing the development of foreign sovereign immunity law and noting that a claim of sovereign immunity raises a jurisdictional defense); *The Schooner Exch. v. McFaddon*, 11 U.S. 116, 135 (1812); (holding that American courts had no jurisdiction over an armed French vessel found in United States waters); *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 485 n.5 (1983) (indicating that subject matter jurisdiction and personal jurisdiction each turn on application of the substantive provisions of the FSIA).

No court in the United States has jurisdiction to execute against a foreign sovereign's property until these determinations are made. Accordingly, we find that the district court erred when it authorized issuance of the October 2004 writs without first determining that an exception to the FSIA immunity applied to the property executed against. The result of that error is that the district court had no jurisdiction to enter that order. This kind of error cannot be cured by subsequent modification because the order was void *ab initio*. Accordingly, we vacate the October 2004 orders that authorize execution against the Congo's interest in royalties.

C. *FG Hemisphere II*: SNPC's Working Interest

In *FG Hemisphere II*, the Congo Defendants argue that the district court erred in determining that the Garnishees' obligation to pay SNPC's working interest is a debt obligation. They contend that SNPC and the Garnishees were co-owners of working interests under the JOA and that SNPC

21

owns a working interest to take oil produced in the Congo–not oil "owed" by the Garnishees to SNPC.

The Congo Defendants assert that the district court mischaracterized SNPC's property as "obligations" owed to SNPC. They further argue that the agreements for SNPC to take liftings do not convert the under-lifted positions of SNPC into an "obligation" on the part of the Garnishees. Just as in *FG Hemisphere I*, the Congo Defendants contend that the district court erred in applying the § 1610(a) exception to immunity to the Congo's property because the Garnishees did not possess obligations due to SNPC that were "in the United States" or "used for commercial activity in the United States."

FG Hemisphere counters that the JOA parties agreed not to distribute, pro rata by working interest share, the oil or proceeds from each lifting directly to each working interest holder; instead they entered into agreements that create legal obligations in the Garnishees toward SNPC. FG Hemisphere contends that the December 2004 garnishment writs were properly issued because SNPC's working interest was property of the Congo, in the United States, that was used for commercial activity in the United States.

Among their various arguments, the Congo Defendants raise the jurisdictional defense that SNPC's property–property of the Congo, as stipulated by the parties–is immune from execution pursuant to the FSIA. FG Hemisphere argues, *inter alia*, that this property satisfies the § 1610(a) exception to immunity. As the threshold determination, we first address the sovereign immunity claim. We do not reach the parties' other arguments about SNPC's property because there was error as a matter of law in the analysis of the immunity claim and the interpretation of § 1610(a). *See* discussion *infra* Part III.C.3.

22

To apply the § 1610(a) exception to executional immunity, there must be a finding that the property is located in the United States *and* used for commercial activity in the United States. The absence of either prong is fatal to the § 1610(a) executional immunity exception. In addition, there must be a waiver of immunity by the foreign sovereign. Therefore, the district court could have jurisdiction over FG Hemisphere's action to garnish SNPC's working interest share only if the Congo has waived its immunity from execution against this working interest, *and* (1) the working interest share is property of the Congo that was in the United States when the district court authorized execution against it, *and* (2) the working interest share has been used for commercial activity in the United States. The discussion in part III.A and our conclusion that, to satisfy the § 1610(a) situs requirement, the property must be in the United States when the district court authorizes execution, also apply to the immunity determination about SNPC's working interest. As we explained in Part III.B., this determination must be made prior to authorization of execution.

In the December 2004 order authorizing execution against "the obligations owed by the Garnishees to SNPC that SNPC owes to the Congo," the district court found that the Garnishees owe intangible obligations to SNPC and in turn to the Congo under the terms of the JOA. The district court made a number of additional findings of fact and conclusions of law, including the following:

(1) the Garnishees advance to SNPC the JOA expenses via a transaction that functions like a revolving loan, therefore these obligations are not immune under the FSIA;

(2) the Congo's "waiver of immunity on sovereign immunity grounds" was not the only waiver; there were others that effectively waived any FSIA defense, including the defense that the property was not used for commercial activity in the United States;

(3) the Congo has authorized seizure of its property in the United States;

23

(4) the intangible property at issue is simply a species of the previous determination made in this proceeding that the property was used for commercial purposes; and

(5) when this proceeding was instituted, the Garnishees held assets for the Congo in the United States.

The district court concluded that "[b]ased on the application for writs of garnishment and the response in opposition thereto, these obligations are property of the Congo, SNPC has assets located in the United States that have been used for commercial activity in the United States and, therefore, FG Hemisphere may execute on said property."

We have reviewed the writ application and response thereto and find the factual basis used to support the district court's conclusion is, at best, inconclusive–and, at worst, insufficient–as to that part of SNPC's working interest (if any) that is intangible property. Moreover, the district court's findings of fact and conclusions of law reveal an erroneous interpretation and application of § 1610(a). Some of the factual findings are clearly erroneous. Others, though not clearly erroneous, were used in the district court's misinterpretation and/or misapplication of law.

The district court's ultimate conclusion was that FG Hemisphere may execute on SNPC's working interest share *because* it is an asset located in the United States and used for commercial activity in the United States. As explained below, this conclusion is erroneous. *See* discussion *infra* Part III.C.3. We discuss, but do not decide, whether the factual basis for this conclusion was sufficient.

1. *The Factual Basis For The December 2004 Immunity Determination*

In accord with the statute, *Af-Cap II* does not permit a § 1610(a) exception to immunity for obligations that were not used for commercial purposes in the United States. *Af-Cap II*, 389 F.3d at

24

504. The fact that property was generated by commercial activity, namely, oil exploration, is irrelevant; what matters under § 1610(a) is what the property is used for. *Walker Int'l I*, 395 F.3d at 235-36; *see also Af-Cap I*, 309 F.3d at 251 ("What matters under [§ 1610(a)] is what the property is 'used for,' not how it was generated or produced."). "[E]ven if a foreign state's property [was] generated by commercial activity in the United States, that property is not thereby subject to execution or attachment if it is not used for a commercial activity within our borders." *Af-Cap I*, 309 F.3d at 251 (internal quotation marks omitted).

In its December 2004 order, the district court stated that "the Garnishees . . . owe to SNPC certain intangible obligations under agreements relating to [the 1979] Convention." This order does not otherwise mention the Convention, JOA, or Amendment to Lifting except in reference to the Congo's waiver of immunity and the Garnishees' royalty obligations. The district court concluded that the Garnishees' payments of SNPC's share of operation expenses, and recoupment of their payments from SNPC's share of oil, is a transaction that *functions like* a revolving loan–and is therefore not immune under the FSIA–but did not determine whether this transaction *is* a loan or other intangible obligation. Similarly, the district court made no factual findings that support its determination that the Garnishees' obligation to pay SNPC's working interest share is property that satisfies the § 1610(a) requirements. There is no factual basis in the district court's analysis to support its conclusion that the Garnishees owe intangible obligations to SNPC that are not immune from execution.

FG Hemisphere argues that the working interest share has been used for commercial activity in the United States to finance the lifting and production of oil, and/or to finance the costs of such production. According to FG Hemisphere, the Garnishees' obligation to pay SNPC its working

interest share has been used to finance the production and lifting of oil in Congolese waters. FG Hemisphere characterizes the reimbursement to the Garnishees as a use of the Garnishees' obligation to give SNPC its working share. FG Hemisphere asserts that this use of SNPC's working interest share to reimburse the Garnishees is payment of a "commercial debt" to the Garnishees. FG Hemisphere further asserts that the Garnishees are deemed to be "in the United States" for purposes of the FSIA, and were undisputedly based in the United States when this action commenced in federal court. Therefore, FG Hemisphere contends, this reimbursement use of the working interest share is commercial activity in the United States under the FSIA, just as in *Af-Cap II* the Congo's use of royalties to pay a commercial debt to a United States-based creditor was commercial activity in the United States. *See Af-Cap II*, 383 F.3d at 368, 370-71 and 389 F.3d at 504.

FG Hemisphere's argument is creative but it does not accurately describe the sequence of these transactions. Pursuant to the JOA, the Garnishees advance SNPC's share of the operating expenses. SNPC is then obligated to reimburse the Garnishees; it is SNPC's debt obligation. After an oil lifting, SNPC takes less than its working interest share of the production with the remaining part of its share used to reimburse the Garnishees. Just over one third of the total production is retained by the Garnishees to reimburse themselves. It is not clear how the repayment of SNPC's debt to the Garnishees becomes SNPC property in the hands of the Garnishees solely because the Garnishees and SNPC agreed that SNPC may reimburse the Garnishees by letting them keep part of an oil lifting that otherwise would be paid to SNPC.

Neither the district court's factual findings nor FG Hemisphere's argument in this interlocutory appeal indicates that SNPC's working interest was used for commercial activity within the United States. The district court's conclusion that this property was located in the United States

26

was based on a previous, unrelated situs determination and on a situs snapshot taken at commencement of the federal garnishment proceedings. The district court's factual findings do not support its conclusions of law. The district court misapprehended § 1610(a) in making the immunity determination and authorized execution against SNPC's property because it incorrectly applied the law to the facts.

2. *Erroneous Facts and Errors of Law–Two Examples*

The December 2004 order contains a number of findings and conclusions that reveal misinterpretation of law, factual errors, and misapplication of law to the facts. We shall discuss two examples. First is the statement that there had been a previous finding and holding that SNPC's working interest share was used for commercial purposes. Second is the holding that the Congo waived its FSIA defenses and authorized seizure of its property.

The district court deemed the working interest to be "simply a species of the previous determination made in this proceeding that the property was used for commercial purposes." The previous determination was in the modified October 2004 order that authorized execution against the royalty obligations. The immunity determination about SNPC's working interest share is not "a species" of the determination about the royalty obligations. Moreover, the district court cannot rely on the October 2004 determination because it had no subject matter jurisdiction at that time.

Prior to issuing a garnishment order, a district court must make factual findings that support application of the § 1610(a) exception to executional immunity during the situs snapshot for *each* form of property. For example, a foreign sovereign's car does not become exempt from executional immunity solely because it was previously determined that the sovereign's airplane was not protected by FSIA immunity. Likewise, a previous determination that royalty obligations were used for

27

commercial activity in the United States tends to neither prove nor disprove whether a working interest share was used for commercial purposes in the United States.[3] As a matter of law, the working interest share could only be executed against if both § 1610(a) requirements were met and the Congo's waiver of immunity applied to SNPC's property. The obligation to pay SNPC's working interest would not be exempt from executional immunity just because the § 1610(a) exception applied to the obligations to pay royalties.

Next, the district court's finding that the Congo waived its FSIA defenses regarding SNPC's property is clearly erroneous. The Congo stipulated that any SNPC property was also the Congo's property, but reserved its right to challenge whether such property is: (1) property in which SNPC has a right or interest; (2) sited "in the United States"; and (3) "property used for a commercial activity in the United States" within the meaning of 28 U.S.C. § 1610(a). Contrary to the district court's findings, the Congo did not waive its FSIA defenses. Moreover, the § 1610(a) defenses are jurisdictional and can only be waived by failure to raise the sovereign immunity claim.

3. *The Dispositive Error of Law*

The error of law critical to our disposition of *FG Hemisphere II* is the conclusion that a determination that the foreign sovereign's property is not immune to execution necessarily, and without more, results in an order authorizing execution. This error is also among the reversible errors in *FG Hemisphere I*.

In restating its October 2004 order, the district court concluded that the royalty obligations were property located in the United States and used for commercial activity in the United States, thus

---

[3]Similarly, exemption from executional immunity during one situs snapshot does not mean that, during another situs snapshot, the property is not immune from execution.

"satisfying the requirements of the Foreign Sovereign Immunities Act and enabling the plaintiff to execute on said property. Therefore, it is Ordered that [FG Hemisphere]'s Application for Writs of Garnishment is Granted." This statement highlights what may be a common misapprehension of the law. The December 2004 order repeats this misinterpretation and misapplication of law:

> [T]he Court determines that said obligations constitute property of the Congo and that SNPC has assets located in the United States, which have been used for commercial activity within the United States, *therefore, satisfying the requirements of the Foreign Sovereign Immunities Act and enabling the plaintiff to execute on said property.*
> *Therefore, it is Ordered that plaintiff's Application for Writs of Garnishment is Granted.*

Thus, the district court granted FG Hemisphere's applications for writs of garnishment as the consequence of its determination that the property satisfied the requirements of an exception to the FSIA's immunity from execution.

A finding that an exception to executional immunity applies is a finding that the court has jurisdiction over the garnishment action. This is not the same as concluding that execution is appropriate or that writs of garnishment should issue. As actions supplemental to or in aid of execution, according to Federal Rule of Civil Procedure 69, garnishment actions are governed by state law to the extent it does not conflict with federal law.[4] Fed. R. Civ. P. 69(a); Tex. Civ. Prac. &

---

[4]"In Texas, a royalty interest in a mineral estate is considered to be an incorporeal form of real property and is held to have the same attributes as real property." *Jones v. Cooper Indus., Inc.*, 938 S.W.2d 118, 122 (Tex. App. 1996). As revealed in the following explanation of this concept, the Congo's interest in royalties and SNPC's working interest may well be comprised of both real property and intangible personal property:

> Texas law provides that oil and gas are realty when in place and personalty when severed from the land by production. With respect to debt obligations incurred as oil and gas are produced, unaccrued royalty interests, oil payments and bonus payments are deemed by Texas courts to be interests in realty, for such rights represent interests in the oil and gas still in place on the property. The rule is otherwise when the

Rem. Code §§ 63.001-63.008 (providing for garnishment actions); Tex. R. Civ. P. 657-79 (same); *Grenada Bank v. Willey*, 694 F.2d 85, 87 n.2 (5th Cir. 1982) ("A writ of execution cannot be the exclusive means of enforcing a judgment since [the State's] practice and procedure provides for garnishment.").

We note that there have been no findings whether the royalty interest and working interest are real property, intangible personal property, or both. Likewise, there has been no finding that the property is garnishable under Texas law. Application of an exception to immunity is but the first step, yet a very important step, that gives the district court jurisdiction to apply state law to determine whether it should authorize execution against the foreign sovereign's property.

Because the district court misinterpreted and misapplied § 1610(a), we reverse its December 2004 order authorizing execution against this property. The garnishment writs issued as a direct result of legal error. Therefore we remand the matter with instructions to dissolve the writs issued pursuant to this order.[5]

---

> minerals giving rise to the right to payment have already been taken from the ground, for the right to future payments on past production cannot be said to burden the mineral estate in the same way as an interest in future production. The right to payment for past production obviously has no effect upon the value to the leaseholder of the oil and gas still in the ground at the time the mineral estate changes hands which property is the usual object of leaseholder interest. So it is that accrued royalty interests are personal property, as is the right to payment for severed minerals.

*Phillips Petroleum Co. v. Adams*, 513 F.2d 355, 363 (5th Cir. 1975) (citations omitted). That issue is not presented in this interlocutory appeal.

[5]The parties also filed with this court a variety of ancillary petitions and motions not discussed in this opinion. The Garnishees have petitioned for two writs of mandamus. The first challenges the district court's order denying their motion to transfer venue. The second relates to oil presumed to have been lifted in April 2006 and taken by the Congo and challenges the district court's early April 2006 order that the Garnishees post bond in an amount equivalent to the actual value of the April lifting. At the time of the order to post bond, the parties and the district court expected that more than

D. Summary

We hold that, prior to authorizing execution against the property of a foreign sovereign, the district court must make factual findings that support application of the § 1610(a) exception to the FSIA immunity from execution. We also hold that § 1610(a) requires that the foreign sovereign's property be located in the United States when the district court determines whether the exception applies. There has been no determination whether the Garnishees were located in the United States during the proper situs snapshot. Also, though the district court modified its order authorizing execution against the royalty obligations to include a determination that they were subject to the § 1610(a) exception to the FSIA's immunity from execution, there was no such determination prior to authorization of execution.

Finally, the § 1610(a) exception to immunity allows the district court to decide whether to grant the application for garnishment or other form of execution against the property of a foreign sovereign; it does not determine whether, under state law pursuant to Rule 69(a), such property is garnishable or otherwise subject to execution. The October 2004 and December 2004 orders evidence a misapprehension and misapplication of law in this regard.

IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's October 2004 and December 2004 orders that granted FG Hemisphere's applications for writs of garnishment. We REMAND each of these cases with instructions that the writs of garnishment be dissolved.

---

$25,000,000 in oil would be lifted–and taken by the Congo–in mid-April 2006. Also filed with this court are motions to supplement the record and to take judicial notice of certain proceedings in the Western District of Texas. We separately dispose of the parties' ancillary petitions and motions.